**Mary S. AMLUNG, Appellant,**

v.

**BANKERS BOND COMPANY, Inc., et al.,
Appellees.**

Court of Appeals of Kentucky.

Feb. 17, 1967.

Martin J. Duffy, Jr., Edward W. Bensinger, Louisville, for appellant.

Raymond O. Harmon, A. J. Deindoerfer and William P. Swain, Boehl, Stopher, Graves & Deindoerfer, James P. Sohan, Louisville, for appellees.

PALMORE, Judge.

The appellant, Mary S. Amlung, brought this suit against her former husband, Bertram W. Amlung, and Bankers Bond Company, Inc., a brokerage firm, for the re-

covery of certain corporate stocks owned by her and illegally sold by Amlung with the innocent (but negligent) assistance of Bankers Bond. Mrs. Amlung appeals and Bankers Bond cross-appeals from a judgment awarding partial recovery to Mrs. Amlung. Bertram Amlung has not appealed, and his liabilities are not in question.

Mrs. Amlung's father, who died in 1936, left her a considerable estate in trust. Half the corpus was distributed in 1954 and the other half in 1959. It was on these occasions that Mrs. Amlung received the 17 certificates evincing her sole ownership of the stocks later sold by her husband. Just before the 1954 distribution Mr. and Mrs. Amlung jointly rented a safety deposit box in a local bank. Later, a larger box was rented in her name alone, but with the right of access by either of them.

During the 14 months immediately following the 1954 distribution Amlung, without his wife's knowledge or consent, removed seven stock certificates from the lock box, forged Mrs. Amlung's endorsements, and sold the stocks through the agency of Bankers Bond. In each instance one or another of the officers at Bankers Bond, trusting Amlung, guaranteed Mrs. Amlung's signature. Upon completion of the sales, checks were made out by Bankers Bond to Mrs. Amlung and handed to Amlung, who proceeded to forge Mrs. Amlung's endorsements on the checks and convert them to his own use, still without her knowledge or consent.

Within three years after the 1959 distribution Amlung went through the same procedure with 10 more stock certificates. He left Mrs. Amlung in July of 1962. Three or four weeks later, her suspicions being now fully aroused, she went to the lock box for the first time since 1954[1] and discovered the losses.

Mrs. Amlung's complaint demanded that the defendants be required to bring about a return of the stocks in kind or to pay the current cash equivalent, including dividends that would have been received but for the unauthorized sales. Among its defenses Bankers Bond pleaded laches, or estoppel by reason of negligence, and the 5-year statute of limitations, KRS 413.-120(6).

The judgment from which these appeals arise applied the 5-year statute of limitations to the 1954 and 1955 transactions and awarded Mrs. Amlung (1) the value, as of the time of their sale, of the stocks sold after the 1959 distribution, and (2) the value of all subsequent dividends on those stocks with 6% interest thereon from date of issuance.

Mrs. Amlung challenges two aspects of the judgment, contending (a) that the 5-year statute of limitations should not have been applied to bar recovery on the 1954 and 1955 transactions and (b) that she should be awarded the enhanced current value of the stocks rather than the value when sold.

Bankers Bond claims error on the grounds (a) that it was entitled to a favorable judgment on the plea of laches or estoppel and (b) that the allowance of after-accrued dividends was erroneous.

With respect to the limitations question, Mrs. Amlung's theory is that KRS 413.140 is the applicable statute. It provides as follows:

"(1) The following actions shall be commenced within one year after the cause of action accrued:

\* \* \* \* \* \*

"(h) An action for the recovery of stolen property, by the owner thereof against any person having the same in his possession.

"(i) An action for the recovery of damages or the value of the stolen property, against the thief or any accessory.

\* \* \* \* \* \*

1. The certificates received in 1959 had been placed in the box by Mr. Amlung while she waited outside the bank vault.

"(3) In respect to the action referred to in paragraph (h) of subsection (1) of this section, the cause of action shall be deemed to accrue at the time the property is found by its owner.

"(4) In respect to the action referred to in paragraph (i) of subsection (1) of this section, the cause of action shall be deemed to accrue at the time of discovery of the liability."

It will be noted, of course, that the pertinent subsections of this one-year statute apply to actions arising out of theft, and the period runs from the time the property is found or the liability is discovered, as the case may be. The trial court having found that Mrs. Amlung knew nothing of the losses until after her husband left her in July of 1962, and the suit having commenced on March 20, 1963, she is entitled to recover on the 1954 and 1955 losses if that is the appropriate statute. Bankers Bond, however, contends the case falls exclusively under KRS 413.120, which provides as follows:

"The following actions shall be commenced within five years after the cause of action accrued:

\*     \*     \*     \*     \*     \*

"(6) An action for the taking, detaining or injuring personal property, including an action for specific recovery."

The latter statute makes no provision for delayed discovery by the injured party. See Dragoo v. Cooper, 72 Ky. (9 Bush) 629 (1873).

There is little or no case history to aid in determining the relationship between the limitations provisions in question. The 5-year statute is much the older of the two laws. That portion of the 1-year statute pertaining to stolen property first appears as Ch. 71, Art. VI, § 6 of the General Statutes enacted in 1873, where it reads as follows:

"Actions for the recovery of stolen property may be commenced against any persons ·having had the same in possession within one year from the time the property is found by the owner thereof, and not after; and actions for the recovery of damages, or the value of stolen property, must be commenced against the thief or any accessory, within one year from the time of the discovery of the liability."

Unquestionably the 5-year limit applied to actions for the recovery of stolen property prior to enactment of the foregoing 1-year statute. Dragoo v. Cooper, 72 Ky. (9 Bush) 629 (1873). Whether the latter enactment was intended to remove suits for the repossession of stolen property and suits for monetary recovery against the thief or his accessories from the purview of the 5-year statute, or was intended only to modify the 5-year statute by further restricting the period of limitations depending upon earlier discovery,[2] is a question that need not be decided, because we have concluded that as against Bankers Bond the suit does not come within the terminology of the 1-year statute anyway.

The words "stolen" and "thief" connote criminality as distinct from civil tort. Used in the same connection, the word "accessory" must be taken in the same sense— that is, an accessory to the crime. Though Bankers Bond was physically an "accessory" in the sale of Mrs. Amlung's stock, it was not an accessory to the crime, because it was innocent of any criminal knowledge or intent. Since Bankers Bond was neither thief nor criminal accessory, and since obviously it did not have possession of the stolen property when the suit was brought, KRS 413.140 could not be applicable. The trial court was correct in adjudging that recovery against Bankers Bond for the stocks

---

**2.** In order for Mrs. Amlung to prevail, it would be necessary to hold that the 1-year statute is exclusive.

sold in 1954 and 1955 was barred by KRS 413.120, the 5-year statute.

■ The traditional measure of damages for the conversion or destruction of personal property is the fair market value of the property at the time and place of the loss, with interest, in the discretion of the jury, from the time of the conversion. Sanders v. Vance, 23 Ky. (7 T.B.Mon.) 209, 213, 18 Am.Dec. 167 (1828); Lane v. Rowland, 295 Ky. 868, 175 S.W.2d 1000, 1002 (1943). "Where property is destroyed, or is converted, so that the title either is, or is regarded as, out of the former owner, damages are the pecuniary representative of the property, and take its place. The plaintiff has lost or abandoned his claim to the *property;* his claim against the defendant is for an equivalent sum of *money.* In this point, a conversion very nearly resembles a sale." 1 Sedgwick on Damages 630, § 317 (9th ed., 1912). "In an action for the conversion of personal property, the measure of damages is the value of the property at the time of the conversion, with interest." Id., Vol. 2, p. 950, § 493. According to the same authority, in actions for the conversion of stock or other property of fluctuating value some courts have held the measure of damages to be the highest market value the property may have had from the date of the conversion to the end of the trial. Id., Vol. 2, p. 991, § 507. See also 53 Am.Jur. 891 (Trover and Conversion, § 99). However, there is no precedent for it in this state, and it is our opinion that the trial court properly determined that Mrs. Amlung's principal recovery was limited to the value of the stocks at the times of conversion. It should be recognized that this rule works both ways, and would have redounded to Mrs. Amlung's benefit had the market declined.

In Western Union Telegraph Company v. Davenport, 97 U.S. 369, 24 L.Ed. 1047 (1878), the owners of stock which the corporation had transferred on its books pursuant to forged endorsements were held entitled to recover the dividends accrued on the stock after the unauthorized transfers. However, as counsel for Bankers Bond points out, that was a suit for restoration of the stock itself, and was against the issuing corporation. Theoretically, the complainants had lost their certificates, but not their ownership interest in the corporation, and the corporation simply was compelled to recognize it. But that is not possible in this case, because Bankers Bond no longer has possession or control of the stock sold and there is no principle of law by which it can be compelled to replace it in lieu of money damages. What might have been the result had Mrs. Amlung applied to the corporations on whose books the unauthorized transfers were ultimately consummated is a question this litigation does not present.

■ Consistent with the principles already discussed, we are forced to the conclusion that Mrs. Amlung's recovery of consequential damages over and above the value of the stock at the time or times of conversion is limited to interest. "So in a case of bonds bearing interest at 4% and worth par, the measure of damages was the value of the bonds with legal interest, not 4% interest, from the date of conversion." 2 Sedgwick on Damages 952–953, § 493a (9th ed., 1912), citing Govin v. Di Miranda, 140 N.Y. 474, 35 N.E. 626 (1893). Here again, had there been no dividends on the stock, Mrs. Amlung still could have been allowed interest. It is our opinion that allowance of the equivalent of after-accrued dividends (including stock splits) in lieu of interest was error.

The claim of Bankers Bond that its defense of laches should have been sustained is based on the contention that Mrs. Amlung knew or by the exercise of reasonable diligence could have known her husband was disposing of her stocks. She knew that he drank, gambled and consorted with other women, and she should have realized that he did not have enough income of his own

to afford these extravagances. In 1955 or 1956 she sold $10,000 worth of stock to extricate him from a gambling debt. In 1958 she pledged 297 shares of Falls City Brewing Company (of which her late father had been president) to secure a $24,000 loan made necessary in part by debts he had incurred theretofore.[3] It was testified in behalf of Bankers Bond that a confirmation was mailed to Mrs. Amlung following each of the stock sales in question.

On the other hand, she testified that she never suspected him of taking her stock certificates; that he took care of all her business affairs; that he very often came home in the morning and intercepted the mail, and if any of the confirmations from Bankers Bond actually did reach her hands she threw the envelopes away unopened, thinking they contained advertising matters; that when she learned occasionally from her bank that dividends had not been received, she made inquiries of her husband and was satisfied by his replies to the effect that he would write the company; etc. He had the income tax returns made up, and she examined them only to the extent of ascertaining what they owed.[4] At one point in her testimony, when asked why she had not consulted her brother-in-law, Hon. Martin J. Duffy, Jr., an eminent attorney, as to what she "should do about this stock that was disappearing," she answered, "I did not realize it was disappearing that fast."

At first impression this last reply could be taken as an indirect admission that Mrs. Amlung knew or suspected what was taking place before the final moment of truth arrived. On the other hand, she may very well have meant that she did not *realize that quickly* that her stock was disappearing. In any case, the comment was called to her attention on redirect examination and she was asked whether she had been aware that her stocks "were disappearing at all," to which she replied, "No, I had no suspicion at all."

■ The burden of proof on the issue of laches rested on Bankers Bond. The findings of fact reveal that the trial court was not convinced that Mrs. Amlung had actual notice of her husband's activities with respect to her stock certificates. We are of the opinion that the evidence was not so persuasive as to force a different conclusion. This leaves the question of whether a conclusive case of laches was produced on the basis of negligence.

"Ordinarily, actual knowledge on the part of the complainant * * * is necessary in order to charge him with laches. However, knowledge may in some circumstances be imputed to him by reason of opportunity to acquire knowledge, or where it appears that he could have informed himself of the facts by the exercise of reasonable diligence, or where the circumstances were such as to put a man of ordinary prudence on inquiry." Taylor v. Commonwealth, Ky., 302 S.W.2d 584 (1957); 27 Am.Jur.2d 710–711 (Equity, § 167).

■ "Ordinary prudence" depends, of course, on the particular circumstances of the case. Some married women exercise punctilious dominion over the financial affairs of the household. Others leave such cares, including the management of their own separate estates, to the husband. Are we to say that the latter class of women does not meet the standard of ordinary prudence? If so, we thrust the old-fashioned woman from the full shelter of the law. The trial court was not convinced that the facts of this case convict Mrs. Amlung of laches, and neither are we. The expression "man of ordinary prudence" cannot be employed in a literal sense. Apparently Mrs. Amlung

---

3. See Amlung v. First National Lincoln Bank of Louisville, Ky., 411 S.W.2d 465 (decided February 10, 1967).

4. Despite the fact that the stocks were gone, Amlung continued to show the dividends on the tax returns for 1957 and subsequent years.

was an ordinary, unassuming housewife with no business experience or acumen, a good woman trusting her husband, forgiving his indiscretions, suspecting nothing beyond what she actually knew, and clinging to her faith until the end. It is in this context, we think, that the reasonableness of her conduct must be judged. We cannot find her innocence unreasonable.

The judgment is affirmed on the appeal, and is affirmed in part and reversed in part on the cross-appeal with directions that it be modified in accordance with this opinion.

WILLIAMS, C. J., and MILLIKEN, MONTGOMERY, HILL and STEINFELD, JJ., concur.