**Jerry BATSON, Executor of The Estate of Margaret Louise Wright, Appellant,**

v.

**Charles CLARK, Bill Wilcox, and Leonard Gilbreth, Individually, and d/b/a Downtown Carpets Warehouse, Appellees.**

No. 1997–CA–000535–MR.

Court of Appeals of Kentucky.

Oct. 16, 1998.

D. Bailey Walton, Bowling Green, for Appellant.

Mike Reynolds, Linda B. Thomas, Bowling Green, for Appellees.

Before GARDNER, HUDDLESTON and KNOX, JJ.

## OPINION

KNOX, Judge.

This is an appeal from a judgment of the Warren Circuit Court holding appellant, Jerry Batson, as Executor of the Estate of Margaret Louise Wright, liable to appellees Charles Clark, Bill Wilcox and Leonard Gilbreth, Individually and d/b/a Downtown Carpets Warehouse, for damages in a total amount of $22,913.18 arising out of a lease agreement.

On July 1, 1987, John Wright leased a parcel of land and a building in Bowling Green, Kentucky, to Billy Miller (Miller) for a period of ten (10) years. The lease was to run from July 1, 1987, through June 30, 1997. Rent was set at $925.00 per month. Miller and his business partner, Larry Gilbreth (Gilbreth), planned to move their carpet business into the building. Although Miller and Gilbreth were partners in the carpet company, the lease was entered into by Miller only, as an individual, and not in the name of the business. The lease agreement contained the following clauses:

SUCCESSORS AND ASSIGNS: This agreement shall be binding upon and inure

to the benefit of the parties hereto, their heirs, administrators, executors and assigns.

SUBLETTING: This lease shall not be assigned, sublet in any manner or respect by the lessee without the prior written consent of the Lessor.

John Wright died before Gilbreth and Miller moved their business onto the property. Subsequently, Gilbreth and Miller dissolved their partnership. Appellees Gilbreth, Charles Clark (Clark), and Bill Wilcox (Wilcox) formed a partnership called Downtown Carpets Warehouse (Downtown Carpets) and moved into the same property which Miller had leased from John Wright. On November 11, 1988, by a written "Sublease Agreement," Miller assigned all of his rights under the lease to Gilbreth, and Gilbreth assumed all of Miller's obligations under the lease for its entire term through June 30, 1997. The sublease agreement contained the following provisions:

3. The parties to this agreement acknowledge that this Sublease Agreement is subject to the written consent of the Lessor, John R. Wright, now deceased, which consent should be obtained from his personal representative.

4. This Sublease is for the entire remaining term of the lease heretofore referred to between Wright and Miller.

Neither Gilbreth nor his two partners ever obtained written consent from Margaret Wright, John Wright's wife and personal representative, to sublet the property. However, testimony during the trial of this matter established that: (1) Gilbreth personally told Margaret that he was "taking over" the Miller lease; (2) Margaret visited the premises and witnessed, first-hand, the operation of Downtown Carpets; (3) Clark's wife and Gilbreth's wife, on separate occasions, had hand-delivered monthly rental payments to Margaret; and, (4) Margaret accepted rent payments from appellees, pursuant to the terms of the original lease, for a period of approximately six (6) years following her husband's death.

Margaret Wright died testate on December 17, 1994. At the time of her death, the rent on the premises was current. Appellees believed they would continue to lease the property, following Margaret's death, for the remainder of the ten-year term, i.e., through June 30, 1997.

Appellant, Jerry Batson (Batson), was appointed executor of Margaret's estate on January 13, 1995. During the course of administering the estate, Batson determined that he would attempt to sell the subject property. He had been collecting rent from appellees, since Margaret's death, pursuant to the terms of the original lease. Approximately seven (7) months after being appointed executor, however, Batson sent a letter to Clark dated August 23, 1995, in which Batson noted his opinion that the lease was now month-to-month. Further, Batson demanded that appellees pay higher rent or, alternatively, vacate the premises:

You are currently a tenant in a month to month lease covering the premises located at 1266 U.S. 31W. Bypass. This is formal notice that effective October 1, 1995, the rent for the premises will be increased from $950 to $1250 a month. If this rental increase is acceptable to you, then payment of the new rent amount will be due on October 1, 1995. If it is not acceptable, then you will need to vacate the premises by midnight on September 30, 1995.

At the time Clark received this letter, Downtown Carpets was current in paying its monthly rent.

By way of correspondence dated August 30, 1995, Clark informed Batson that Downtown Carpets would vacate the premises by September 30, 1995. Clark included in his letter a reference to a storage building which appellees constructed on Margaret's property, at their own expense and with Margaret's approval: "As I told you on the phone we own the storage building in back of the property that we paid $10,000.00 for and we will be willing to sell this to the owners for a price of $4,000.00 if they are interested."

Batson responded a few days thereafter by way of letter, stating his position that the storage building was a permanent fixture and, therefore, owned by the estate. Clark then hired a lawyer, who corresponded with Batson on September 12, 1995, addressing

these points: (1) Batson had produced no documentation authorizing him to alter the terms of the lease which set monthly rent at $925 for a 10–year period; and, (2) Clark had an agreement with Margaret Wright that if Downtown Carpets ever vacated the premises, he would be obligated to remove the storage building. Clark's lawyer closed the letter by stating that Downtown Carpets would vacate the premises by September 30, 1995, but that Clark would honor his agreement with Margaret, and remove the storage building.

Appellees moved their business into a different location by September 30th, as they had agreed to do. However, having received no authority from Batson to remove the storage building, they left the building on the property. Appellees testified they vacated the premises and left the building there under protest, with the intent to resolve the matter in court. Appellees filed a claim against the estate on October 24, 1995, in Warren District Court. Batson responded with the following letter, dated October 30, 1995:

> This letter is to acknowledge receipt of the claim against the Estate of Margaret Wright filed by your clients, Charles Clark, Bill Wilcox and Leonard Gilbreth, d/b/a Downtown Carpets Warehouse. Please be advised that the claim is being disallowed. I believe the claim is barred by the applicable statute of limitations as set out in KRS 396.011. Please notify your clients of this disallowance. I am sure you are aware that KRS 396.055 requires a claimant to commence an action against the personal representative not later than 60 days after the mailing of a notice of disallowance or the claim will be barred. I am warning you as the attorney for the claimants of the impending bar as required by KRS 396.055. Please pass this information along to your clients.

On April 3, 1996, five (5) months following the disallowance notice, appellees filed a complaint in Warren Circuit Court against Batson, as executor of Margaret's estate, alleging breach of their lease and wrongful conversion of their storage building. The following month, on May 14, 1996, Batson sold the subject property, including the storage building for $125,000. In June 1996, the estate filed a motion to dismiss the claims of appellees, arguing that the trial court had no jurisdiction to entertain the action. Specifically, Batson argued that: (1) the initial claims were barred by the statute of limitations (KRS 396.011); (2) the claims were not correctly filed (KRS 396.015); and, (3) the time had expired for the filing of litigation against Margaret's estate (KRS 396.055). The trial court denied the motion to dismiss, and proceeded with a bench trial. At the conclusion of trial, the court found that Batson had breached appellees' lease and, further, had converted appellees' storage building. The court awarded appellees damages of $18,389.28 for Batson's breach of lease and $4,523.90 for Batson's conversion of their storage building. Batson has appealed that decision.

On appeal, Batson alleges: (1) that appellees' claims were barred in the first place by KRS 396.011 and 396.055; (2) that appellees waived their claim for contract damages when they voluntarily moved off the premises; (3) that the storage building to which appellees claim ownership became a permanent fixture and a part of the realty, to be sold with the rest of the property; (4) that appellees failed to prove, by competent evidence, the fair market value of the storage building; (5) that the trial court erred in finding that the sublease was valid and effective, absent any proof of Margaret Wright's written consent or knowledge; and (6) that the trial court incorrectly calculated the damages award.

*Statute of Limitations*

▆ Batson argues that because appellees did not file their claim against Margaret Wright's estate within six (6) months after Batson's appointment as executor, their claim was barred in the first place under KRS 396.011(1), which reads:

> All claims against a decedent's estate which arose before the death of the decedent, excluding claims of the United States, the state of Kentucky and any subdivision thereof, whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract, tort, or

other legal basis, if not barred earlier by other statute of limitations, are barred against the estate, the personal representative, and the heirs and devisees of the decedent, unless presented within six (6) months after the appointment of the personal representative, or where no personal representative has been appointed, within two (2) years after the decedent's death. Batson maintains that KRS 396.011(1) required appellees, because they had a leasehold interest, to assert a claim against Margaret's estate regarding their leasehold interest, as well as a claim regarding their ownership interest in the storage building on the property, all within six (6) months of Batson's appointment as executor of Margaret's estate (i.e., by July 13, 1995).

Batson further argues that appellees' cause of action against Margaret's estate is barred by KRS 396.055(1), the pertinent portion of which reads:

> As to claims presented in the manner described in KRS 396.015 of this Act within the time limit prescribed in KRS 396.011, the personal representative may mail a notice to any claimant stating that the claim has been allowed or disallowed.... Every claim which is disallowed in whole or in part by the personal representative is barred so far as not allowed unless the claimant commences an action against the personal representative not later than sixty (60) days after the mailing of the notice of disallowance or partial allowance if the notice warns the claimant of the impending bar.

Batson points out that not only did he disallow appellees' claim, but he specifically gave notice to appellees of the 60–day bar referenced in KRS 396.055(1) by way of letter dated October 30, 1995. As such, he argues, appellees had only sixty (60) days from October 30, 1995, within which to file their cause of action against Batson and the estate. Appellees, however, did not file this litigation until April 3, 1996, approximately five (5) months following Batson's notice of disallowance. As such, Batson argues, this cause of action is barred.

We disagree with Batson's position. In fact, we do not consider appellees' allega-

tions to be probate-type "claims" at all, i.e., they arose *after* the death of the decedent, Margaret, and represent obligations created, not by Margaret for any wrongful conduct she committed, but by the executor himself for actions he took after Margaret's death. In other words, appellees' cause of action accrued against the executor of Margaret's estate, not against Margaret. As used in probate statutes, such as KRS 396.011, which limit the time frame in which creditors may present their claims against an estate ("nonclaim" statutes, as they are routinely called), the word "claim" generally refers to "debts or demands against the decedent which might have been enforced *against him during his lifetime* ...." 31 Am.Jur.2d *Executors and Administrators* § 603 (1989) (emphasis added). Margaret took no action during her lifetime which would have prompted this litigation and, thus, appellees could not have enforced these claims against Margaret during her lifetime because they had not yet accrued.

KRS 396.035 states in part that "[n]o action shall be brought against a personal representative on a claim against decedent's estate unless the claimant shall have first presented his claim [to the personal representative] in the manner described in KRS 396.015." The precursor to this statute, Ky. St. § 3872, in effect in the late nineteenth and early twentieth centuries, was very similar, the pertinent part of which stated: "[N]o action shall be brought or recovery had on any demand ... until demand of payment thereof has been made of the personal representative, accompanied by the required affidavit." Kentucky's case law interpreting this former statute supports our conclusion that appellees' claims were not subject to formal presentation in the first place.

For example, in *Crenshaw v. Duff's Ex'r*, 113 Ky. 912, 69 S.W. 962 (1902), the Crenshaws had executed a promissory note to Edmund Duff, to whom they made payments until Duff's death, at which time they began making payments to Duff's executor. Seventeen (17) years after Duff died, the Crenshaws finally satisfied their debt. However, the final payment they made to the executor

represented interest which had been charged at a rate higher than legal interest. The Crenshaws sued George Duff in his capacity as executor of Edmund Duff's estate, seventeen (17) years after Duff died, to recover their final payment on the ground that it constituted usury. The executor moved to dismiss the action on the basis that the Crenshaws had failed to file a claim ("demand") against the estate under § 3872 of the statutes, quoted above.

The trial court dismissed the Crenshaws' cause of action, finding they should have first filed a claim against Edmund Duff's estate. The appellate court, however, disagreed:

> [N]o usury was paid in the lifetime of decedent, Edmund Duff, but it was paid, if any was paid, to the executor, George T. Duff. The executor having received that to which neither he nor his testator's estate was entitled (assuming that the payments were made as alleged in the petition), the executor was bound to refund to appellant the excess which constituted the usury. This demand was against the executor, and not against the estate of the testator. Therefore it is not of that class of claims embraced in the provisions of sections 3870–3872, Ky. St. *No demand or verification was necessary.*

*Id.* at 963 (emphasis added). See *Lucking's Adm'r v. Gegg,* 75 Ky. 298, 12 Bush 298 (1876), in which decedent's surety sued decedent's executor for reimbursement of funds the surety paid to satisfy decedent's debt. The executor moved for dismissal of the action, arguing the surety had not filed a claim against the estate prior to bringing suit, as he was required to do under the statute. The court disagreed and held that the surety was not required to file a claim against the estate: "His right of action accrued against the personal representative, and not against the deceased, and it is not such a demand as is contemplated by the 37th section of article 2, chapter 39, of the General Statutes [equivalent to § 3872]." *Id.* at 299. *See also Berry v. Graddy, Adm'r of Belt,* 58 Ky. 553, 1 Met. 553, 555 (1859) ("debts created by the

personal representative himself ... [are not], properly speaking, demands against the estate of the decedent....").

Likewise, in *Cowles' Ex'r v. Johnson,* 297 Ky. 454, 179 S.W.2d 674 (1944), the plaintiff sued decedent's executor for damages resulting from executor's erroneous calculation of the tobacco base on land which the executor had sold to plaintiff after decedent's death. The court held that plaintiff was not required to file a claim against the estate prior to bringing suit. "[T]he claim was not one against a decedent's estate but was a claim against the executor himself...." *Id.* at 675.

In the present case, appellees' claim is against Margaret's executor and, as such, we do not believe appellees' claims are subject to the deadlines set out in KRS 396.011(1) and 396.055(1). Further, we do not believe the fact that appellees actually filed a claim against the estate, later denied by Batson, is significant. Based upon the above-cited case law, appellees' allegations are not in that class of "claims" which must be filed against the estate prior to bringing suit. Thus, appellees had no obligation to file an initial claim against Margaret's estate, despite the fact they did.

Appellees' cause of action for breach of contract accrued on, or shortly after, August 23, 1995, the date of Batson's letter notifying appellees of the changes in the terms of the lease. Appellees filed this litigation on April 3, 1996, just over six (6) months later. We believe appellees' complaint to have been timely filed. As for appellees' request for declaration of rights concerning ownership of the storage building, appellees were notified in early September 1995 of Batson's position that the building was owned by Margaret's estate. They filed suit six (6) months later. Again, we believe appellees' complaint, as it concerned ownership of the building, was timely filed.[1]

We do not believe appellees' claims were subject to the deadlines set out in KRS 396.011 and 396.055. Interestingly, however,

---

1. Despite the pending litigation, Batson sold the property, including the storage building, less than six (6) weeks after appellees filed their litigation asking the court to resolve the issue of ownership of the building.

even under Batson's theory that appellees' claims were, in fact, subject to those statutes, appellees' litigation would nonetheless have been timely filed. KRS 396.011(1) encompasses only those claims "which arose before the death of the decedent." Appellees' claims did not arise until *after* Margaret's death, when her executor refused to honor the lease agreement between Margaret and appellees. Thus, appellees had no breach of contract claim against Margaret during her lifetime regarding the lease or sublease agreement. On the contrary, Margaret fully honored the terms of the agreement for a six-year period.

Further, as concerns the storage building, appellees, who testified it was their understanding they were to remove the building when they vacated the premises, had no reason to assert an ownership interest therein until the executor, Batson, claimed ownership of the building on behalf of the estate. Batson did not change the terms of the lease, nor did he claim an interest in the storage building, until over *seven* (7) months after he had been appointed executor of Margaret's estate. Thus, even if appellees' claims of breach of contract and conversion had been subject to the time restrictions set out in KRS 396.011(1), appellees could not possibly have filed a claim against Margaret's estate within six (6) months of Batson's appointment as executor. Thus, it was impossible for appellees to comply with KRS 396.011, and in the interest of fairness, they should not be held to it.

KRS 396.055(1) begins with the following language: "As to claims presented in the manner described in KRS 396.015 of this Act *within the time limit prescribed in KRS 396.011 ...."* Given this language, we believe the claims addressed in KRS 396.055 are those filed pursuant to KRS 396.011, either because they arose before the decedent's death and necessarily had to be filed in accordance with KRS 396.011, or because they were otherwise filed within six (6) months of the appointment of the executor. As we stated earlier, appellees' claims did not arise before Margaret's death, nor were they even capable of being filed within six (6) months of Batson's appointment, considering

the cause of action had not yet accrued within that time frame. Thus, KRS 396.055(1) could not have barred appellees' claims even if they had been subject to Chapter 396.

As we have stated, we do not believe appellees' claims were subject to KRS 396.011 and 396.055. However, we have made this statutory analysis for the purpose of establishing that even when viewing this case from Batson's position that these statutes apply to appellees' claims, those claims, in any event, would not have been barred by either KRS 396.011 or 396.055. They would have been timely filed pursuant to KRS 396.205 ("limitation on actions not otherwise barred"), the pertinent portion of which is set out below:

> No cause of action on any claim not otherwise barred by the provisions of KRS 396.011 and subsection (1) of KRS 396.055, or any other applicable statute of limitations, shall be brought against the personal representative or against any distributee after the expiration of two (2) years from the date of the order of discharge of the personal representative.

Thus, given the facts of this case, we are persuaded that appellees' litigation was not untimely filed, even when the facts are analyzed under Batson's own theory.

*Waiver of Right to Claim Breach*

▮ Batson maintains that appellees should have remained on the property and forced him to file an eviction proceeding, notwithstanding his ultimatum to appellees that they pay higher rent or otherwise vacate. He argues that because appellees "voluntarily" vacated the premises, they waived any right they may have had to claim damages resulting from Batson's breach of the lease. We disagree.

Charles Clark testified that the move would be expensive and that appellees did not want to move, particularly when Downtown Carpets had just begun to show a profit after several years in business. Additionally, he testified, the location of the business was important, having been established for eight (8) years. Further, Clark testified that he and his partners expressed their interest in purchasing the property and remaining there permanently; Batson, however, did not re-

spond to their inquiries. Bill Wilcox testified that he and his partners, Clark and Gilbreth, discussed Batson's letter demanding more rent and decided to vacate within Batson's time frame. They could not afford the higher rent, and preferred to handle the problem, especially the issue concerning ownership of the storage building, through the court system. Leonard Gilbreth testified that he and his partners vacated the premises under protest, with the intent to resolve the matter in court.

Given appellees' testimony, it is questionable whether appellees "voluntarily" vacated the premises. Nonetheless, appellees left under protest, having fully stated their position to Batson. They chose to petition the court for assistance, as was their prerogative. In doing so, they did not waive their claim to damages for breach of contract. Further, we do not believe that remaining on the property would have served any purpose other than to postpone an unavoidable lawsuit, by one or the other of the parties. We adopt the reasoning of the trial court:

> Walton, counsel for Wright's estate, argues that the partners' claim for breach of contract cannot be enforced due to the fact that the partnership vacated the premises. He contends that its vacating the premises is a waiver of the alleged breach and that the partnership should have forced an eviction proceeding. The Court finds this argument lacks merit. Such a requirement would do nothing more than postpone the inevitable, which is a lawsuit, such as this, claiming breach of contract.

*Character of the Storage Building*

The trial court found the storage building, commonly known as a "pole barn," to be a trade fixture which appellees had the right to remove. Batson argues that the pole barn was permanently attached to the pre-existing building and, as such, was a permanent fixture to be sold with the property. The evidence before the trial court, however, does not support Batson's argument. Having reviewed the videotape of this matter, we adopt the trial court's summary of the evidence:

> In 1993, [Margaret] Wright gave her oral approval for the partnership to build a

pole barn/warehouse on the back of her property. However, Wright insisted on the following two requirements: (1) the partners were to take the addition with them when they no longer leased the property, and (2) in the event that Wright's property tax increased, the partners were to pay the increase.

Wilcox contacted Dale Williams about constructing the building and Baldock's, Inc. about the materials needed for constructing the building. The partners chose the pole barn type of building because it would be easy to take down and take with them when they eventually moved. The only damage left behind would be the holes in the asphalt where the poles had been placed. The cost of relocating the pole barn would be approximately $3,000.00 to $5,000.00.

The total cost of constructing the pole barn was approximately $8,523.90. Wright contributed no money to the erecting of the pole barn.

The construction of the pole barn consisted of ten poles, metal sheets, trusses and a roof. The poles were placed two feet in the ground into one square foot of poured concrete. The pole barn had no footer, no flooring and no foundation. The existing building's gas and electrical supply had to be tapped into in order to supply such to the pole barn. A breezeway was built from the existing building to the pole barn. The breezeway was connected to the pole barn and the existing building with two by fours and metal screws.

The pole barn was used by the partners to store carpet that could not be housed inside the existing building. The breezeway served as a covered walkway so that customers could be brought back to the pole barn to examine carpets without being exposed to the elements.

■ The trial court analyzed the character of the building under *Tarter v. Turpin*, Ky., 291 S.W.2d 547 (1956), and noted the three factors that must be examined when determining whether an article is a fixture:

> First, annexation to realty, either actual or constructive; second, adaptation or appli-

cation to the use or purpose that the part of the realty to which it is connected is appropriated; and, third, the intention of the parties to make the article a permanent accession to the freehold with title to the article in the one owning the freehold. *Id.* at 548. (Citation omitted). The *Tarter* court emphasized that the key factor is the intention of the parties. *Id.* (citing *American Rolling Mill Co. v. Carol Mining*, 282 Ky. 64, 137 S.W.2d 725 (1940)). Further, "as between landlord and tenant[,] the greatest latitude and indulgence is given to the claim that fixtures attached to the realty by the tenant remain personal property." *Warren Post No. 23, Am. Legion v. Jones*, 302 Ky. 861, 196 S.W.2d 726, 729 (1946) (citations omitted).

■ The trial court relied upon *Bank of Shelbyville v. Hartford*, 268 Ky. 135, 104 S.W.2d 217 (1937) for its analysis as to whether appellees' storage building was a trade fixture, defined as "an article annexed by the lessee to the real estate to aid him in carrying on his trade or business on the premises[,]" which may be removed at the end of a tenant's term. *Id.* at 219 (citations omitted). The court found the present case to be factually similar to *Bank of Shelbyville*, in which it was determined that a number of bowling alleys, seats, and other equipment were trade fixtures. We agree with the trial court and adopt its well-stated conclusions of law:

Applying the rationale of *Hartford* to the case at hand, it appears that the pole barn in this case is also a trade fixture. The evidence produced at trial indicated that the pole barn was attached to the property by drilling approximately ten holes in the pavement at the rear of the building. The holes were filled with concrete with the poles being placed therein. No foundation or footers were used in annexing the pole barn to the property. The evidence further indicated that the breezeway was connected to both the existing building and the pole barn by means of a two by four and metal screws.

As was the case in *Hartford*, the damage caused to the property upon removal of the pole barn would be minimal at best. Moreover, the pole barn could not be considered any part of the property because, as stated in *Hartford*, it was not necessary to the enjoyment of the existing building on the part of Wright to have a pole barn attached to the rear of the property.

As to the intention of the parties, all three partners testified that Wright agreed to the erection of the pole barn, that she demanded that they take it with them when they left and that they chose to build the pole barn rather than some other type of building due to its ease of being transported. Batson, on the other hand, admits that Wright granted the partners permission to build a temporary building at the rear of the property. He testified that she was concerned as to whether the pole barn being constructed was temporary or permanent. The intention of the parties from the outset was that the pole barn be temporary and portable.

The issue then becomes whether, in fact, the pole barn was temporary. Having already examined the nature of the pole barn itself, the Court concludes that the pole barn was a temporary building. As a result, the pole barn is hereby deemed to have been a trade fixture, removable by the partners upon their vacancy.

### Fair Market Value of the Storage Building

■ The trial court found that Batson wrongfully converted appellees' storage building when he sold Margaret Wright's property, including the building. From the exhibits submitted by appellees, the trial court determined that appellees' cost of constructing the storage building in 1993 was $8,523.90. To arrive at appellees' damages, the court subtracted $4,000.00 from the total cost of construction, the amount appellees would have paid, according to their testimony, to relocate the building had they been permitted to remove it. The court awarded total damages of $4,523.90 for wrongful conversion. Batson argues that appellees failed to prove the fair market value of the storage building and, thus, damages were improperly awarded.

Appellees maintain they introduced sufficient evidence of the building's fair market

value by way of their testimony that they offered to sell Batson the storage building for $4,000. They argue that, given their experiences in real estate over a period of many years, this testimony constitutes credible proof of the building's fair market value, i.e., it is proof of the price for which a willing seller would sell the building and a willing buyer would purchase it.

■ Recovery for conversion of personal property is determined by proof of the fair market value of the property converted at the time of conversion. *Nolin Prod. Credit Ass'n v. Canmer Deposit Bank*, Ky.App., 726 S.W.2d 693, 704 (1987) (citation omitted). See also *Amlung v. Bankers Bond Co.*, Ky. App., 411 S.W.2d 689 (1967) which states:

> The traditional measure of damages for the conversion or destruction of personal property is the fair market value of the property at the time and place of the loss, with interest, in the discretion of the jury, from the time of the conversion. *Sanders v. Vance*, 23 Ky. (7 T.B.Mon.) 209, 213, 18 Am.Dec. 167 (1828); *Lane v. Rowland*, 295 Ky. 868, 175 S.W.2d 1000, 1002 (1943). "Where property is destroyed, or is converted, so that the title either is, or is regarded as, out of the former owner, damages are the pecuniary representative of the property, and take its place. The plaintiff has lost or abandoned his claim to the *property;* his claim against the defendant is for an equivalent sum of *money.* In this point, a conversion very nearly resembles a sale." 1 Sedgwick on Damages 630, § 317 (9th ed., 1912). "In an action for the conversion of personal property, the measure of damages is the value of the property at the time of the conversion, with interest." Id., Vol. 2, p. 950, § 493.

*Id.* at 693 (emphasis in original).

The trial court calculated damages based upon the cost to construct the storage building in 1993, rather than its fair market value in 1995, the year in which the building was converted. We believe the court erred in doing so. Further, we do not believe appellees introduced evidence sufficient to establish the building's fair market value. We do not believe their testimony of the price for

which they would have sold the building is sufficient. While there may have been a willing seller in the matter, Batson did not respond to appellees' offer and, thus, there was no willing buyer. Given the trial court's erroneous calculation of damages, and in light of appellees' failure to prove the fair market value of the storage building, we reverse the trial court's award of damages for conversion.

*Validity of Sublease*

■ The original ten-year lease in this case was executed by John Wright, the property owner, and Bill Miller, appellee Gilbreth's original partner. Gilbreth testified that he began making rent payments shortly after the lease was executed. John Wright died soon thereafter and, not having been instructed to do otherwise, Gilbreth made all required rent payments to Margaret, Wright's wife and personal representative. Gilbreth and Miller then dissolved their partnership, and Gilbreth, Clark, and Wilcox formed a partnership under the name of Downtown Carpets. Gilbreth and Miller entered into an agreement whereby Gilbreth subleased the property from Miller. The sublease agreement included the parties' acknowledgment that it was subject to Margaret's written consent. Appellees admitted they did not obtain Margaret's written consent, but testified that she was fully aware of Miller's having left the partnership and Gilbreth's having "taken over the lease." She accepted appellees' rent payments for six (6) years prior to her death. Batson testified that Margaret, nonetheless, considered appellees to have a month-to-month lease.

The trial court found that Margaret, through her conduct over the course of several years, waived her right to terminate the original lease. The court held that the sublease was effective and that Margaret had an obligation to honor the terms of the original lease. The court reasoned as follows:

> When a lease requires by its own terms that the lessee obtain written consent from the lessor before subleasing or assigning his interest in the property, the lessee's failure to obtain such consent does not automatically terminate the lease; but instead constitutes a ground for forfeiture

which can be exercised at the option of the lessor. *Setzer's Steel Systems v. Chenault Development Corp.,* Ky., 725 S.W.2d 22, 24 (1987); *Venters v. Reynolds,* Ky., 354 S.W.2d 521, 524 (1961).

An exception to this general rule, however, has been carved out by Kentucky courts. This exception provides that when the lessor has accepted rent from the sublessee with knowledge that a sublease occurred, then the lessor waives his right to forfeiture and must honor the underlying lease agreement. *Id.*

The facts of this case fall within the above mentioned exception. There is no dispute and it is a well settled fact that Wright and her estate accepted rent from the sublessees for a period of almost seven years. The remaining issue is whether Margaret Wright had knowledge of the sublease when she accepted the rent. There is no direct evidence that Wright was aware of the sublease. There was, however, testimony that Wright considered the partners' tenancy, in contradiction of the plain terms of the original lease, to be month to month. The Court finds that Wright could not contend such unless she was aware that a sublease had taken place. The Court concludes that Wright waived her right to terminate the original lease and that the sublease was effective.

Batson maintains that *Setzer's Steel Systems* and *Venters* require appellees to prove that Margaret had actual knowledge of the sublease. Batson argues the evidence before the trial court does not support the conclusion that Margaret had knowledge that the sublease entered into by Miller and Gilbreth existed. Consequently, Batson contends, the court erroneously held the sublease to be effective. We disagree.

Testimony from the partners established that Margaret received $925 per month in rent over a period of approximately six (6) years, a total of nearly $67,000. Many of the rental payments were delivered to her personally by the spouses of Wilcox and Clark, and Margaret collected some payments at the premises itself, where she could observe the operation and those individuals involved in it. Further, Gilbreth testified he told

Margaret that he was "taking over the lease" and that Miller was leaving. We believe the evidence supports the conclusion that Margaret had "knowledge," whether actual or constructive, of the sublease arrangement entered into by Miller and Gilbreth, and we believe that is all that is required under *Setzer's Steel Systems* and *Venters.* The sublease was effective under the holding of *Venters:*

> The subleasing of a portion of the lot without the consent of the lessor constituted a ground of forfeiture at the option of the lessor. The acceptance of rent from the lessees with knowledge that the sublease covenant had been violated, as the lessor here must have known, was, in effect, a waiver of her right to insist on a forfeiture or cancellation of the lease.

*Venters,* 354 S.W.2d at 524. (Citation omitted).

*Calculation of Damages for Breach of Lease*

■ In support of their claim for damages resulting from Batson's breach of their lease, appellees submitted a list of relocation and remodeling expenses they incurred in moving from the subject premises to a new business location. Included in the list were these costs: (1) purchase and installation of a sign with the address of their new location; (2) construction of ramp entrances required for disabled persons; (3) purchase and installation of carpet; (4) utility payments and rent at both the old location and the new one during the month of September 1995; (5) moving costs; and, (6) attorney fees of $400. The trial court found that appellees had incurred relocation expenses and attorney's fees in a total amount of $18,389.28, and awarded appellees damages resulting from Batson's breach of the lease agreement in that amount.

Batson argues that appellees are limited to damages for wrongful eviction, which include the actual or rental value of the unexpired term less the rent reserved, cost of moving, actual expenses reasonably incurred, and loss of profits. He maintains the only competent evidence of damages offered by appellees was the proof of their moving expenses total-

ing $1,079.21. Appellees, however, maintain they are entitled to damages based upon their expectation interests, e.g., that sum of money which would put them in the same position in which they would have been had Batson performed the contract. They argue that but for Batson's wrongful eviction, they would not have incurred moving and relocation expenses. Thus, they claim, they submitted valid proof of damages. Further, they argue that attorney's fees are appropriate under the circumstances, given the evidence of bad faith on Batson's part.

■ We agree with appellees' position. They were entitled to be placed in the same position in which they would have been had they not been forced from the property.

> In the case of a breach of contract, the goal of compensation is not the mere restoration to a former position, as in tort, but the awarding of a sum which is the equivalent of performance of the bargain—the attempt to place the plaintiff in the position he would be in if the contract had been fulfilled.

*SEG Employees Credit Union v. Scott*, Ky. App., 554 S.W.2d 402, 406 (1977) (citation omitted). We believe appellees are entitled to the damages awarded by the trial court. As for the award of attorney's fees in the amount of $399.50, Batson is correct that "attorney's fees are not allowable as costs in absence of statute or contract expressly providing therefore." *Kentucky State Bank v. AG Services, Inc.*, Ky.App., 663 S.W.2d 754, 755 (1984) (citations omitted). However, we further stated in *Kentucky State Bank*, "this rule does not, we believe, abolish the equitable rule that an award of counsel fees is within the discretion of the court depending on the circumstances of each particular case." *Id.* (Citation omitted). In the present case, the trial court, in its discretion, found that attorney fees were appropriate, and we will not disturb that finding.

*Conclusion*

For the foregoing reasons, we affirm these rulings made by the trial court: (1) appellees' litigation was not untimely filed; (2) appellees did not waive their claim for breach of contract damages when they moved off the premises; (3) the storage building was a trade fixture which appellees were entitled to take with them when they moved off the premises; (4) the sublease entered into by Gilbreth and Miller was valid and effective; and, (5) appellees are entitled to an award of damages for breach of contract in the amount of $18,389.28. However, we reverse the trial court's award of damages for conversion, and remand with instructions to enter an order consistent with this opinion.

GARDNER, J., concurs.

HUDDLESTON, J., concurs in part and dissents in part.

HUDDLESTON, Judge, concurring in part and dissenting in part.

I respectfully dissent from that portion of the Court's opinion that reverses the award to the Appellees of the fair market value of the storage building. There was proof that the storage building was constructed in 1993 at a cost of $8,523.90. The trial court subtracted $4,000.00 from that amount, the sum that the Appellees acknowledge they would have paid to relocate the building had they been permitted to remove it. The trial court then awarded damages of $4,523.90 for wrongful conversion. I believe that this evidence was sufficient to fix the value of the building when it was converted by the Appellant some two years later. I would, therefore, affirm the trial court on this issue.

I concur in the balance of the Court's opinion.