NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0701n.06

No. 10-5528

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Oct 05, 2011

LEONARD GREEN, Clerk

ALABAMA FARMERS COOPERATIVE, INC.,          )
                                            )
          Plaintiff-Appellant,              )          ON APPEAL FROM THE
                                            )          UNITED STATES DISTRICT
          v.                                )          COURT FOR THE WESTERN
                                            )          DISTRICT OF KENTUCKY
DENNIS JORDAN,                              )
                                            )
          Defendant-Appellee.               )
                                            )

BEFORE:  COLE and ROGERS, Circuit Judges, and SARGUS, District Judge.[*]

ROGERS, Circuit Judge.  This diversity landlord-tenant dispute presents two questions on appeal: whether the lease to certain farmland was renewed by actions that did not include a sufficient manifestation of intent to renew, and whether 34 greenhouses constructed on the property are "trade fixtures" such that the tenant was entitled to remove them at the end of the lease.  The landlord is correct that, under Kentucky law, the lease was not renewed.  However, Kentucky law makes clear that the greenhouses are trade fixtures that the tenant was entitled to remove.

Plaintiff Alabama Farmers Cooperative (AFC) operates a number of plant nurseries throughout the country.  The co-op hired defendant Jordan in 1988 as a plant salesman.  After several informal discussions with AFC about opening a growing station in Kentucky, Jordan purchased

_____

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

fifteen acres of land in Hardin County for $28,500, and leased the land back to AFC under a five-year lease beginning August 1, 1995. Jordan became the Station Manager of the nursery, known as "Upton Station." The lease called for AFC to make annual rent payments of $4,400, and gave AFC both an option to purchase the land from Jordan at any time for $28,500 (the original purchase price) and an option to renew the lease at the end of five years for another five-year term at the same annual rent.

The July 31, 2000 expiration date for the lease came and went without any perceptible attempt to exercise the renewal option, although AFC remained on the land. In December 2000, AFC sent Jordan a proposed new lease for the period of August 1, 2000 through July 31, 2005. Jordan thought he was not receiving enough in annual rent and initially refused to sign, but after AFC agreed to increase the price of the purchase option from $28,500 to $40,000, Jordan relented and executed another five-year lease, which included another five-year renewal option (through July 31, 2010), exercisable at the end of the lease term. For his services as Station Manager, Jordan was also paid several hundred thousand dollars a year in salary and commissions.

Between August 1995 and July 2005 (when the second lease was set to expire), the parties constructed 34 greenhouses on the land. The greenhouses are simple, but valuable, structures consisting of metal frames secured in concrete footings and covered by six-millimeter-thick plastic. Construction of the greenhouses was a joint effort. AFC fronted the money for the materials and labor, while the actual work was performed by Jordan (in his capacity as Station Manager) and people he hired. Once the metal frames were enclosed, Jordan paid to install plumbing and

ventilation fans inside the greenhouses. Concrete walkways were also poured inside several of the structures. The record reflects that Jordan was reimbursed for his time, labor, and out-of-pocket expenses incurred in constructing the greenhouses.

The July 31, 2005 expiration date for the second lease also came and went without any word from AFC. Once again, AFC continued to occupy Upton Station. But this time, the co-op stopped paying rent. In December 2006, Jordan announced that he was quitting as Station Manager. When AFC realized that Jordan was about to resign, AFC tried to get Jordan to sign another five-year lease, through July 31, 2010. Jordan refused and demanded his rent. In an effort to forestall the coming standoff, AFC immediately tendered all of the back rent due and again urged Jordan to sign a new lease. Although Jordan accepted the late rent payment, he refused to sign a new lease, instead treating AFC as a holdover tenant under a year-to-year tenancy. *See* Ky. Rev. Stat. § 383.160(1). Jordan ejected AFC on July 31, 2007, two years after the expiration of its second five-year lease, and claimed that the greenhouses were now his because they were permanent improvements to his land.

AFC filed this diversity suit for declaratory and monetary relief, alleging breach of contract and related claims. The case was referred to a magistrate with the consent of the parties. The parties filed cross motions for summary judgment, asking the court to resolve two issues: first, whether AFC exercised its option to renew the second lease for another five-year term by continuing to occupy the land; and second, whether the greenhouses were permanent improvements to the land, or instead "trade fixtures" that AFC was entitled to remove at the end of the lease. The district court ruled in favor of Jordan on both issues. The court held that there was no outward manifestation of intent to

renew the lease and that the parties' relationship was therefore governed by Kentucky's holdover statute, Ky. Rev. Stat. § 383.160(1). The court also held that the parties intended the greenhouses to be permanent improvements to the land and that they were, in fact, permanently affixed to the land. AFC challenges these two rulings on appeal.

The district court properly granted summary judgment in favor of Jordan on the issue of whether the lease was renewed through July 31, 2010, because AFC did not outwardly manifest an intent to exercise the renewal option. The 2001 lease states in relevant part:

> The Lessee shall have the option to renew this lease at the end of five (5) years for another (5) years at the same annual rent.

R. 57-12. The terms of the option do not require any particular affirmative act—such as giving prior notice to the landlord—to effectuate the renewal.

Because jurisdiction in this case is based on diversity of citizenship, Kentucky law provides the substantive rules of decision. *See, e.g.*, *Stalbosky v. Belew*, 205 F.3d 890, 893-94 (6th Cir. 2000). Under Kentucky law, in the absence of a renewal, AFC's status as a continued occupant of Upton Station would be governed by Kentucky's holdover statute, which provides:

> If, by contract, a term or tenancy for a year or more is to expire on a certain day, the tenant shall abandon the premises on that day, *unless by express contract he secures the right to remain longer*. If without such contract the tenant shall hold over, he shall not thereby acquire any right to hold or remain on the premises for ninety (90) days after said day, and possession may be recovered without demand or notice if proceedings are instituted within that time. But, if proceedings are not instituted within ninety (90) days after the day of expiration, then none shall be allowed until the expiration of one (1) year from the day the term or tenancy expired. At the end of that year the tenant shall abandon the premises without demand or notice, or stand in the same relation to his landlord that he did at the expiration of the term or tenancy

aforesaid; and so from year to year, until he abandons the premises, is turned out of possession, or makes a new contract.

Ky. Rev. Stat. § 383.160(1) (emphasis added). In essence, § 383.160(1) creates a default relationship between a landlord and a holdover tenant, giving the tenant the right to remain on the land for one year past the expiration of the lease, unless the landlord initiates ejection proceedings within 90 days after that date. *See Masterson v. DeHart Paint & Varnish Co.*, 843 SW.2d 332, 334 (Ky. 1992).

Here, summary judgment was proper because there is no evidence that AFC intended to renew the lease on July 31, 2005, when AFC was required to exercise its renewal option. Although the renewal provision did not require AFC to perform an affirmative act, such as notifying Jordan of its intent to renew, some outward manifestation of that intent is needed for a court to conclude that the parties' relative legal positions are not governed by Kentucky's default rule. *See* Ky. Rev. Stat. § 383.160(1) (express contract required to supplant default relationship). Thus, without some objective demonstration of intent to exercise the renewal option, AFC's continued occupancy of Upton Station is governed by § 383.160(1) rather than by the terms of the lease.

This case does not fall within the narrow category of cases in which Kentucky courts have inferred an intent to renew from continued occupancy, together with the payment and acceptance of rent. For example, in *Klein v. Auto Parcel Delivery Co.*, 234 S.W. 213, 216 (Ky. 1921), the lease in question included a renewal option that called for increased rent during the renewal period. The Kentucky Court of Appeals (Kentucky's highest court at the time) held that the payment and acceptance of the increased rent displayed an intent to renew the lease. Distinguishing a renewal from a default holdover relationship is more difficult when the terms of the renewal period are the

same as the initial lease terms. This is because payment and acceptance of rent would be consistent with both an intent to renew the lease and an intent to be governed by the holdover statute. But even in these situations, the Kentucky high court has stated that there is a "category of cases in which no positive act is required and . . . the holding over, with payment and acceptance of rent, is enough to vitalize the lease for the extended period." *Lexington Flying Service, Inc. v. Anderson's Ex'r*, 239 S.W.2d 945, 948 (Ky. 1951).

This is not such a case, however, because AFC stopped paying rent after the lease expired on July 31, 2005. AFC counters that Jordan's acceptance of the back rent—late as it was—waived his right to later declare a forfeiture of the renewal option. *See Bridges v. Jeffrey*, 437 S.W.2d 732, 733 (Ky. 1968) (explaining that in such cases the breach is cured). But *Bridges* does not help AFC because in that case the acceptance of late rent payments occurred *during the lease term* and waived the landlord's right to declare the forfeiture of a purchase option unrelated to the lease's renewal. Here, in contrast, there was nothing to breach—and thus no right to be waived—if AFC did not renew the lease, *see* Ky. Rev. Stat. § 383.160(1), and the whole point is that AFC's nonpayment of rent for more than a year *after* the lease expired could not possibly have manifested an intent to renew as of July 31, 2005. Whether Jordan actually declared AFC to be in arrears before accepting the late payment (as he alleges), or whether he merely gave notice that he was quitting as Station Manager (as AFC alleges), is immaterial.

Instead, all of the available extrinsic evidence indicates that AFC attempted to negotiate a new lease once it realized that its position as Jordan's tenant was precarious. Only after Jordan

announced his intent to resign in December 2006—more than a year after the second lease expired—did AFC think to reach an agreement with Jordan regarding its continuing status as his tenant. And the attempts to get Jordan to sign a new lease have the flavor of a renegotiation, rather than one party's unilateral exercise of its contractual rights. The parties' similar conduct after the expiration of the initial 1995 lease supports this view. The 2000-2005 lease—not signed until sometime in 2001—could not reasonably be deemed a "renewal" of the 1995-2000 lease because the second lease contained different terms—namely, an increase in the price of purchase option from $28,500 to $40,000. Thus, far from displaying an intent to renew the 2000-2005 lease, the parties' conduct after July 31, 2005 suggests that they intended to treat AFC as a holdover tenant, and the district court's grant of summary judgment on this issue was therefore appropriate.

The greenhouses, however, remain the property of AFC following the termination of the lease, because they are "trade fixtures" under longstanding controlling Kentucky precedent. The greenhouses were clearly erected for trade purposes and there is no evidence that the parties intended them to be permanent accessions to Jordan's land or that removal of the structures would result in any damage to the land. Without such evidence, Jordan cannot rebut the presumption under Kentucky law that these articles—which AFC paid for and used in its nursery business—were removable at the end of the lease term.

Kentucky courts recognize a category of fixtures—"trade fixtures"—that a tenant may keep at the end of a lease. A trade fixture is "an article annexed by the lessee to the real estate to aid him

in carrying on his trade or business on the premises." *Bank of Shelbyville v. Hartford*, 104 S.W.2d

217, 219 (Ky. 1937). The category is broad:

> [t]o constitute any chattel that has been attached to the freeehold a "trade fixture," it is only necessary that it be devoted to what is known in the law of fixtures as a trade purpose, and the form or size of the annexed chattel is immaterial.

*Id.* The key factor is the purpose of the attachment, *id.*, and "[a]s between landlord and tenant . . . the

greatest latitude and indulgence are to be allowed in favor of the tenant's claim to have particular

articles considered as personal chattels rather than as part of the freehold." *Id.* at 218 (citations and

internal quotation marks omitted).

In *Bank of Shelbyville*, the Kentucky high court held that a set of bowling alleys, racks and

seats attached to the interior of a building were trade fixtures that remained the property of the tenant

at the conclusion of the lease. *Id.* The court explained that "because it was not necessary to the

enjoyment of the building on the part of the owners to have bowling alleys in it," "[t]he object and

purpose could not have been otherwise than that [the tenants] put the alleys in the building . . . to

carry on their own business and to make it more profitable." *Id.* at 219. The court concluded that

the bowling alleys remained the property of the tenant. In doing so, the court distinguished cases

involving vendors and vendees, stating flatly that the rule is "more liberal as between landlord and

tenant than between vendor and vendee." *Id.* at 220.

*Bank of Shelbyville* requires the conclusion that the greenhouses in this case are "trade

fixtures." The greenhouses were clearly erected for a "trade purpose." There is no dispute that the

greenhouses were used in AFC's plant-growing operation. Indeed, that is the only use to which they

can be put, and the only reason Jordan wants to keep them.  At the same time, there is nothing

special about the fifteen acres in Hardin County that makes these greenhouses peculiarly adapted to

Jordan's land.  The structures would be just as valuable located somewhere else.

The *Bank of Shelbyville* court further reasoned that removal of the bowling alleys would not

damage the building:

> because the evidence is convincing that the floor of the building would remain just
> as it was before, except possibly a few nails holes where it was necessary to nail
> pieces in the erection of the alleys, but those nail holes could be filled up and if the
> floor became torn in any way by reasons of drawing out the small nails, which were
> eight-penny nails, that could be remedied with very little expense.

*Id.* at 219.  The facts of this case, while involving attachment to the soil rather than attachment to

a building, are not legally distinguishable.  The record reflects that the greenhouses can be

disassembled using a screwdriver and pliers, and that extracting the metal frames from their concrete

footings will result in minimal damage to the land.  At most, removal of the greenhouses will leave

behind several foot-deep holes that can be easily refilled with dirt.  Indeed, it is difficult to see how

ripping out the bowling alleys from inside a building would not cause far more damage to the

building than dismantling the greenhouses would to the land in this case.

The Kentucky Court of Appeals applied this very aspect of *Bank of Shelbyville* in a more

recent case, holding that a storage building—very similar in design to the greenhouses at issue

here—was not a permanent fixture.  *Batson*, 980 S.W.2d at 574.  This building, known as a "pole

barn," consisted of metal sheets, trusses, and a roof supported by poles placed two feet underground

and cemented into holes drilled into the pavement.  *Id.* at 573.  In concluding that the pole barn was

a "temporary" structure rather than a permanent one, the court explained that, "[a]s was the case in [*Bank of Shelbyville v.*] *Hartford*, the damage caused to the property upon removal of the pole barn would be minimal at best," since "the only damage left behind would be the holes in the asphalt where the poles had been placed." *Id.* at 573-74.

Jordan protests that the greenhouses are held together with fifty thousand nuts, bolts, and screws that would take an army weeks or months to disassemble—a task that could not be completed without destroying or damaging the greenhouses. But the test is whether the greenhouses can be removed without damaging the *land*, not whether the greenhouses themselves will suffer some damage in the process. AFC's willingness to expend the time and effort to remove the greenhouses, and to risk any damage to the structures that may ensue, is the result of a business decision that the co-op is entitled to make if the greenhouses are trade fixtures.

Moreover, as in *Bank of Shelbyville*, there is no evidence that the parties intended to make the greenhouses the landlord's property. Indeed, the evidence points directly in the opposite direction. Jordan's own deposition testimony indicates that he believed the greenhouses belonged to AFC all along until the lease expired. Jordan stated that the greenhouses "would have belonged to [AFC] up until the point they didn't renew their lease." R. 57-5 at 85. But if the greenhouses were not trade fixtures but owned by the landowner, such ownership by the landlord would come into effect upon attachment, not somehow upon the later termination of the lease. Similarly, in *Bank of Shelbyville*, the court relied on indicators of the parties' intent that manifested themselves during the life of the lease. 104 S.W.2d at 219.

As in *Bank of Shelbyville*, the tenant paid for the property in question. *Id.* AFC paid for all of the materials and labor—according to Jordan, over $200,000 worth—and reimbursed Jordan for money he invested in the greenhouses. In reasoning that the parties did not intend to make the bowling alleys a permanent part of the building, the *Bank of Shelbyville* court explained that "[i]t is hardly reasonable that [the tenants] would have expended that much money to build the bowling alleys and equip them for the purpose of adding to the wealth of [the landlord], the owner of the property." *Id.* What is more, AFC also insured the greenhouses and—at Jordan's insistence—paid the property taxes on them, which is consistent with AFC's continued ownership of the greenhouses. All of this evidence suggests that the parties did not even intend the greenhouses to be the property of the landlord.

The record does not support a contrary conclusion. The district court relied on the fact that the lease contained an option to purchase the property from Jordan, and that AFC did not exercise this option at the end of the lease. The court reasoned that the parties "did not anticipate that AFC would fail to exercise the purchase option," R. 68 at 12, and inferred from this oversight that the parties "must have intended" the greenhouses to be permanent improvements to the land. *Id.* But that is not a fair inference from the failure to exercise an *option* to purchase the property. The greenhouses are worth far more than the land on which they were built. An option to purchase the land was valuable to AFC because of the possibility that using the greenhouses in Hardin County, Kentucky would continue to make economic sense after the expiration of the lease. But it was equally foreseeable that the greenhouses could be put to more profitable use somewhere else, and

that AFC would therefore have no use for fifteen acres in Hardin County after the lease expired. Negotiating a purchase option enabled AFC to hedge against this uncertainty, and the fact that AFC ultimately did not exercise its contractual right does not suggest anything meaningful about the parties' intent to pass title in the greenhouses to Jordan.

Likewise, the modest increase in the option price from the first lease to the second does not prove that the parties intended the greenhouses to be fixtures. Jordan claims that the increase in the option price from $28,500 to $40,000 reflects the parties' recognition that the land was appreciating in value due to the construction of the greenhouses. But the greenhouses are worth much more than $11,500 (Jordan testified they were worth more than $200,000), so it is more likely that the increase in the purchase option was meant to capture gradual appreciation in the fifteen acres over the course of several years, rather than a sharper spike in value due to the presence of the greenhouses.

Jordan makes a similar claim with respect to the property taxes AFC paid on the greenhouses, arguing that property taxes assessed against his land increased after the greenhouses were built there. In several states, polyethylene greenhouses have been held to be "real" property for tax assessment purposes. *E.g.*, *Tuinier v. Charter Township of Bedford*, 599 N.W.2d 116, 120 (Mich. App. 1999) (collecting cases from Michigan, Texas, New York, and Ohio). These cases rely on the relative permanence with which the structures are affixed to the underlying real estate, rather than on the trade purpose which is at the heart of whether attached property is a trade fixture under Kentucky law. Thus, whether an article should be included in the tax base for property tax assessment and whether it is a "trade fixture" are different questions. The Kentucky Court of Appeals accordingly

held that the pole barn in *Batson* was a trade fixture, where the landlord had demanded that the tenant pay the increase in property tax resulting from the improvement. *See Batson v. Clark*, 980 S.W.2d 566, 573 (Ky. App. 1998). Similarly in this case, AFC paid the property tax on the greenhouses.

In sum, the record establishes that the greenhouses were constructed for the purpose of carrying on AFC's nursery business, the parties intended them to remain AFC's property, and the structures can be removed with little or no damage to Jordan's land. At the very least, there is no evidence to rebut the presumption under Kentucky law that the greenhouses are removable at the end of the lease. *See Bank of Shelbyville*, 104 S.W.2d at 218; *Batson*, 980 S.W.2d at 574. Accordingly, the greenhouses are trade fixtures that belong to AFC.

The district court's declaration that the lease expired is affirmed. The court's conclusion that the greenhouses are not trade fixtures is reversed, and the case is remanded to the district court for entry of judgment consistent with this opinion.