*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0030p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

PAUL F. MIK, JR., LEE ANN MIK, and PALS
ENTERPRISES, LLC,

     *Plaintiffs-Appellants*,

   *v.*

FEDERAL HOME LOAN MORTGAGE
CORPORATION,

     *Defendant-Appellee*.

No. 12-6051

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:12-cv-00273—John G. Heyburn II, District Judge.

Argued: June 19, 2013

Decided and Filed:  February 7, 2014

Before:  GIBBONS and STRANCH, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Alan W. Roles, COLEMAN, ROLES & ASSOCIATES, PLLC, Louisville, Kentucky, for Appellants.  Rick D. DeBlasis, LERNER, SAMPSON & ROTHFUSS, Cincinnati, Ohio, for Appellee.  **ON BRIEF:** Alan W. Roles, Theodore J. Palmer, COLEMAN, ROLES & ASSOCIATES, PLLC, Louisville, Kentucky, for Appellants. Rick D. DeBlasis, LERNER, SAMPSON & ROTHFUSS, Cincinnati, Ohio, for Appellee.  Kent Qian, NATIONAL HOUSING LAW PROJECT, San Francisco, California, C. Matthew Hill, PUBLIC JUSTICE CENTER, Baltimore, Maryland, for Amici Curiae.

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  In May 2012, Paul F. Mik, Jr., Lee Ann Mik, and PALS Enterprises, LLC (collectively, "the Miks") filed suit against the Federal Home Loan Mortgage Corporation ("Freddie Mac"), arguing that they were unlawfully evicted from their rental home after their landlord defaulted on her mortgage and the property was sold at a foreclosure sale.  The district court granted Freddie Mac's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). It interpreted the Miks' complaint as asserting claims under the Protecting Tenants at Foreclosure Act of 2009 ("PTFA"), which imposes certain requirements on successors in interest to foreclosed properties in order to protect tenants.  The district court held that the PTFA does not provide a private right of action and dismissed the complaint.  On appeal, the Miks argue that their claims do not arise under the PTFA and that their complaint asserts claims for wrongful eviction, denial of due process, and outrageous infliction of emotional distress under Kentucky law.

We hold that the PTFA does not provide a private right of action.  Nonetheless, the PTFA  requires successors in interest to foreclosed properties to provide *bona fide* tenants with 90 days' notice to vacate and to allow them to occupy the premises until the end of their lease term unless certain conditions are met.  The PTFA's requirements preempt state laws that provide less protection to tenants.  While tenants may not bring a federal cause of action for violations of the PTFA, they may use such violations to establish the elements of a state law cause of action.  We hold that the Miks have stated a claim for wrongful eviction but have failed to state claims for denial of due process and outrageous infliction of emotional distress.  Therefore, we reverse in part and affirm in part.

**I.**

The Miks allege the following facts in their complaint, and for purposes of reviewing the district court's grant of Freddie Mac's motion to dismiss, we accept their allegations as true. *See Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012).

Paul Mik and his wife Lee Ann own and operate PALS Enterprises, LLC ("PALS"). In October 2010, PALS entered into an agreement with Wanda Meyer giving PALS a lease with an option to purchase a residence that Meyer owned in Meade County, Kentucky. Paul and Lee Ann Mik lived in the residence leased by PALS.

Meyer defaulted on her mortgage, and her lender, CITI Mortgage, Inc., initiated foreclosure proceedings. The Miks were not named as parties in the foreclosure action either by name or as "unknown tenant(s) or occupant(s)." CITI Mortgage was the successful bidder at the foreclosure sale on April 20, 2011, and it assigned its bid to Freddie Mac. The Miks recorded their lease—which they concede was initially unrecorded—on April 12, 2011, but they did not notify CITI Mortgage of the existence of their lease until April 28, 2011. The Miks paid rent on April 1, 2011, but they claim that they did not pay rent thereafter because they did not know to whom rent should be paid.

In June 2011, the Miks contacted Joe Mai, a paralegal at the law firm that represented Freddie Mac. They told him that they had a lease with an option to purchase Meyer's residence and that they desired to remain in the home. Mai told the Miks that they could avoid eviction and stay in the residence until July 25, 2011 if they participated in a relocation assistance program called Cash for Keys, whereby they would be paid $1,500 to vacate the residence. The Miks signed the agreement, but they were not paid $1,500 and did not vacate the residence. The Miks were told to contact Freddie Mac's agent Sherry Bennett Webb, who would arrange for the property to be inspected before the Miks were paid. In July 2011, Paul Mik contacted Webb and informed her that he had a lease with an option to purchase the residence.

On June 15, 2011, Freddie Mac obtained a writ of possession[1] for the property. The writ stated that Meyer was to be evicted from the premises, but it did not mention the Miks. On July 27, 2011, the Miks were informed that they could buy the property for $190,000 and avoid being evicted if they could demonstrate that they qualified for a loan by 5 p.m. on Friday, July 29, 2011. On July 28, 2011, deputies from the Meade County Sheriff's Department arrived at the residence with a copy of the writ of possession. Lee Ann Mik explained that Meyer did not live on the property and that the Miks had not been served with legal documents concerning the eviction. The deputy said that he would return on Monday to lock the Miks out of the residence.

The Miks contacted Mai, who reiterated that the Miks could avoid eviction only by showing that they were approved for a $190,000 home loan by 5 p.m. that Friday. The Miks applied for a loan, and the bank notified Mai that the Miks had submitted an application but that it would take about two weeks to have the property appraised. On July 31, 2011, Webb informed the Miks that they would be evicted the following day. Paul Mik again told Webb that he had a lease and that he had not been served with any court documents.

On August 8, 2011, Paul Mik posted a copy of the lease on the door of the residence with a note stating: "We are asserting our rights under this lease and object to entry by anyone." That day, deputies from the Meade County Sheriff's Department "set out" the Miks' property, removing it from the residence and placing it in the yard. More than $38,000 of property was damaged or destroyed by rain. In November 2011, the Miks obtained the loan for which they had applied and purchased the property from Freddie Mac.

---

[1]A writ of possession is "[a] writ issued to recover the possession of land." *Black's Law Dictionary* 1750 (9th ed. 2009). Kentucky provides a procedure for obtaining a writ of possession:

> The purchaser of land sold under execution and not redeemed, after obtaining a conveyance therefor may, upon ten (10) days' notice in writing to the defendant in the execution, whose lands have been sold, enter a motion on the docket in the circuit court of the county where the land is situated for a judgment for the possession of the land. If, upon the hearing of the motion, the court is of the opinion that the purchaser is entitled to the possession, it shall render a judgment accordingly and award possession, with costs.

Ky. Rev. Stat. Ann. § 426.260(1) (West 2012).

In May 2012, the Miks filed suit against Freddie Mac in federal district court. The complaint alleged that Freddie Mac "disregarded [Section 702] of the Protecting Tenants at Foreclosure Act of 2009." The Miks claimed that they

> relied on the provisions of the Protecting Tenants at Foreclosure Act of 2009 to be able to continue to reside in their home until they were given the notice to vacate required in the statute and until the expiration of the remaining term of the lease as prescribed in the statute, during which time the [Miks] anticipated that their loan application would be approved and they would be able to purchase the subject property from [Freddie Mac].

Next, the complaint alleged that the Miks "were wrongfully evicted when [Freddie Mac] failed to follow due process prior to evicting the [Miks] from their home." More specifically, it alleged that Freddie Mac evicted the Miks without naming them as parties to the foreclosure action or bringing a forcible detainer action[2] against them. Finally, the complaint alleged that Freddie Mac's actions "were outrageous and inflicted severe emotional distress upon the [Miks]." Paul Mik claimed that he "has suffered mental anguish" and Lee Ann Mik stated that she "has experienced severe emotional pain and suffering for which she has been provided medical treatment."

Freddie Mac filed a motion to dismiss the Miks' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Miks' claims are premised on the PTFA, which does not create a private right of action. The district court granted Freddie Mac's motion to dismiss. First, it held that the Miks cannot state a claim under the PTFA, which does not provide an express or implied private right of action. It observed that while the PTFA may be raised as a defense in a foreclosure action in state court, it does not provide a basis for recovering damages in federal court. Second, the district court held that "a reading of the Complaint makes it clear that [the Miks] have asserted only causes of actions under the Act and not under state law." Moreover, it noted that a foreclosure sale extinguishes the rights of tenants under Kentucky law and, therefore,

---

[2]An action for forcible detainer is "a quick and simple legal proceeding for regaining possession of real property from someone who has wrongfully taken, or refused to surrender, possession." *Black's Law Dictionary* 719 (9th ed. 2009).

tenants must raise a defense of due process or unfair conduct during foreclosure proceedings, which the Miks did not do.  The Miks timely appealed the district court's dismissal of their complaint.

## II.

"[A]ll civil actions to which [Freddie Mac] is a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such actions, without regard to amount or value."  12 U.S.C. § 1452(f); *see also* 28 U.S.C. § 1331.  We have jurisdiction to hear the Miks' appeal pursuant to 28 U.S.C. § 1291.

We review *de novo* a district court's order granting a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 597 (6th Cir. 2013).  In so doing, we "construe the complaint in the light most favorable to the plaintiff[s] and accept all allegations as true."  *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012).

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." However, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  A claim for relief is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Plausibility is not the same as probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

### III.

The district court interpreted the Miks' complaint as asserting only claims under the PTFA and held that it does not provide a private right of action. The district court correctly held that the PTFA does not provide the Miks with a federal cause of action, but it incorrectly held that the Miks' complaint only asserted claims under the PTFA.

Congress enacted the PTFA as a temporary measure[3] during the mortgage foreclosure crisis. The PTFA protects tenants who reside in properties that are subject to foreclosure by imposing certain obligations on successors in interest to foreclosed properties. The PTFA requires successors in interest to provide *bona fide* tenants[4] with 90 days' notice to vacate and to allow *bona fide* tenants to occupy the premises until the end of their lease term unless certain conditions are met. Protecting Tenants at Foreclosure Act of 2009, Pub. L. No. 111-22, § 702, 123 Stat. 1632, 1661 (codified at 12 U.S.C. § 5220 note (Supp. V. 2012)). Section 702 states in relevant part:

> (a) IN GENERAL.—In the case of any foreclosure on a federally-related mortgage loan or on any dwelling or residential real property after the date of enactment of this title, any immediate successor in interest in such property pursuant to the foreclosure shall assume such interest subject to—

---

[3]The PTFA originally had a sunset date of December 31, 2012. Protecting Tenants at Foreclosure Act of 2009, Pub. L. No. 111-22, § 704, 123 Stat. 1632, 1662 (codified at 42 U.S.C. § 1437f note (Supp. III 2010)). Congress later changed the date to December 31, 2014. Mortgage Reform and Anti-Predatory Lending Act, Pub. L. No. 111-203, § 1484, 124 Stat. 1376, 2204 (2010) (codified at 42 U.S.C. § 1437f note (Supp. V 2012)).

[4]A *bona fide* lease or tenancy is defined as follows:

(b) BONA FIDE LEASE OR TENANCY.—For purposes of this section, a lease or tenancy shall be considered bona fide only if —

> (1) the mortgagor or the child, spouse, or parent of the mortgagor under the contract is not the tenant;

> (2) the lease or tenancy was the result of an arms-length transaction; and

> (3) the lease or tenancy requires the receipt of rent that is not substantially less than fair market rent for the property or the unit's rent is reduced or subsidized due to a Federal, State, or local subsidy.

Protecting Tenants at Foreclosure Act of 2009, Pub. L. No. 111-22, § 702, 123 Stat. 1632, 1661 (codified at 12 U.S.C. § 5220 note (Supp. V. 2012)).

(1) the provision, by such successor in interest of a notice to vacate to any bona fide tenant at least 90 days before the effective date of such notice; and

(2) the rights of any bona fide tenant, as of the date of such notice of foreclosure—

(A) under any bona fide lease entered into before the notice of foreclosure to occupy the premises until the end of the remaining term of the lease, except that a successor in interest may terminate a lease effective on the date of sale of the unit to a purchaser who will occupy the unit as a primary residence, subject to the receipt by the tenant of the 90 day notice under paragraph (1); or

(B) without a lease or with a lease terminable at will under state law, subject to the receipt by the tenant of the 90 day notice under subsection (1)[.]

*Id.*

"A private right of action is the right of an individual to bring suit to remedy or prevent an injury that results from another party's actual or threatened violation of a legal requirement." *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 296 (3d Cir. 2007) (footnote omitted). "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979). "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Congress may create a private right of action expressly or by implication. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286.

As many courts have recognized, "[n]othing in the express language of Section 702 contains a provision creating a right of action for violations of the section or

establishes any remedy when the section is violated." *Gullatt v. Aurora Loan Servs.*, LLC, 1:10-CV-01109, 2010 WL 4070379, at *3 (E.D. Cal. Oct. 18, 2010); *see also Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1171 (9th Cir. 2013); *Ingo v. Deutsche Bank Nat'l Trust Co.*, No. 2:11-CV-812, 2011 WL 5983340, at *2 (D. Utah Nov. 29, 2011); *Zalemba v. HSBC Bank, USA, Nat'l. Ass'n., as Tr. for MHL-200-1*, No. 10-CV-1646, 2010 WL 3894577, at *2 (S.D. Cal. Oct. 1, 2010).

We cannot conclude that Congress intended to provide an implied private right of action. In *Cort v. Ash*, 422 U.S. 66 (1975), the Supreme Court set forth four factors for evaluating whether a statute implicitly creates a private right of action: (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted"; (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff"; and (4) whether the cause of action is "one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* at 78 (internal quotation marks and citations omitted). The Court has since clarified that these factors are not entitled to equal weight. *Touche Ross & Co.*, 442 U.S. at 575. The "central inquiry" is whether Congress intended to create a private right of action. *Id.* "'[U]nless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" *Thompson v. Thompson*, 484 U.S. 174, 179 (1988) (quoting *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 94 (1981)).

The language of the PTFA does not evince an intent to create a private right of action. "'The question whether Congress . . . intended to create a private right of action [is] definitively answered in the negative' where a 'statute by its terms grants no private rights to any identifiable class.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-84 (2002) (quoting *Touche Ross & Co.*, 442 U.S. at 576)). "For a statute to create such private

rights, its text must be 'phrased in terms of the persons benefited.'"[5] *Id.* at 284 (quoting *Cannon*, 441 U.S. at 692 n.13). "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)).

The title of the PTFA demonstrates that the Act is meant to protect tenants living in foreclosed properties. However, the Act does so by regulating the conduct of successors in interest to foreclosed properties. The Act provides that "any immediate successor in interest" to a foreclosed property "assume[s] such interest subject to" certain limitations. PTFA § 702. The successor in interest takes the property "subject to . . . the provision, by such successor in interest of a notice to vacate to any bona fide tenant at least 90 days before the effective date of such notice." *Id.* The successor in interest also takes the property "subject to . . . the rights of any bona fide tenant . . . under any bona fide lease entered into before the notice of foreclosure to occupy the premises until the end of the remaining term of the lease" unless certain conditions are met. *Id.* Thus, "[t]he entire textual focus of Section 702 is to specify the limitations of the successors in interest's property rights in the types of foreclosed properties that fall under the ambit of Section 702." *Gullatt*, 2010 WL 4070379, at *4; *see also Logan*, 722 F.3d at 1171.

Moreover, the statutory structure does not demonstrate an intent to create a private right of action. During the recent economic crisis, Congress passed the Emergency Economic Stabilization Act of 2008 ("EESA"), codified at 12 U.S.C. §§ 5201-61, in order to "provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United

---

[5] For example, "Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 create individual rights because those statutes are phrased 'with an *unmistakable focus* on the benefited class.'" *Gonzaga*, 536 U.S. at 284 (quoting *Cannon*, 441 U.S. at 691) (emphasis added). Title VI provides that "*[n]o person* . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (emphasis added). Title IX provides that "*[n]o person* . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681 (emphasis added).

States." 12 U.S.C. § 5201.  The EESA authorized the Treasury Secretary to establish the Troubled Asset Relief Program ("TARP"), codified at 12 U.S.C. §§ 5211-41, in order "to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution." 12 U.S.C. § 5211.  The PTFA is part of TARP.  "There is no specific statement of purpose provided in Section 702 expressing that it was intended to carry out something different than the general purposes of TARP and EESA— i.e., providing the Secretary of the Treasury authority to stabilize the financial system." *Gullatt*, 2010 WL 4070379, at *5.

Congress provided a private right of action against the Secretary for those harmed by the Secretary's actions, but it did not provide a private right of action against individuals or non-governmental entities who violate TARP's provisions.  12 U.S.C. § 5229; *see also Gullatt*, 2010 WL 4070379, at *5; *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1185 (N.D. Cal. 2009).  "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290.  "Because Congress included an express provision for private enforcement under one section of the Homes Act, it is 'highly improbable that Congress absent mindedly forgot to mention an intended private action' for other sections of the statute." *Logan*, 722 F.3d at 1172 (quoting *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 (1979)).

Because neither the text nor the statutory structure indicate that Congress intended to provide a private right of action, our analysis need go no further.  *Sandoval*, 532 U.S. at 316 n.7 ("[T]he interpretive inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action.").  We hold that the PTFA does not provide an express or implied private right of action.

## IV.

The district court properly held that the PTFA does not provide the Miks with a federal cause of action.  However, it erred by construing their complaint as stating only claims based on the PTFA. The complaint alleges that the Miks "were wrongfully

evicted," that Freddie Mac "deni[ed them] due process," and that Freddie Mac's actions "were outrageous and inflicted severe emotional distress upon the [Miks]." Therefore, we must consider whether relief may be granted with respect to these claims.

Before we do so, however, we must address the status of the Miks' lease following the foreclosure sale and what Freddie Mac's obligations were as the successor in interest to the foreclosed property. Freddie Mac argues that the foreclosure sale terminated the Miks' lease and that Freddie Mac properly evicted the Miks pursuant to a writ of possession, as permitted by Kentucky law. First, we examine relevant Kentucky law. Second, we consider the effect of the PTFA on the parties' rights and obligations.

**A.**

Freddie Mac cites two sources relied upon by the district court in support of its argument that the foreclosure sale terminated the Miks' lease. Neither source is applicable here.

First, Freddie Mac points to Ky. Rev. Stat. Ann. § 426.574, which provides that "[a] conveyance made in pursuance of a sale ordered by the court shall pass to the grantee the title of all the parties to the action or proceeding." This statute says nothing about the effect of a foreclosure sale on a lease agreement between the former property owner and her tenants, particularly where, as here, the tenants were not parties to the foreclosure action.

Second, Freddie Mac cites *Cumberland Lumber Co. v. First & Farmers Bank of Somerset, Inc.*, 838 S.W.2d 403 (Ky. Ct. App. 1992), which concerns the status of liens placed on a property after the commencement of foreclosure proceedings. In *Cumberland Lumber Co.*, First and Farmers Bank of Somerset, Inc., which held a first mortgage lien against real property owned by Cumberland Industries Corporation ("CIC"), filed a complaint against CIC seeking a sale of the property to satisfy CIC's

indebtedness. *Id.* at 404. It also filed a *lis pendens* notice[6] warning others that CIC's property was the subject of litigation. *Id.* The court entered a default judgment against CIC and ordered the property sold at public auction. *Id.* The bank purchased the property and then filed a complaint against Cumberland Lumber Co. and Lowe's Home Centers, Inc. *Id.* These creditors had obtained judgments against CIC and placed liens on the property after foreclosure proceedings commenced, but failed to intervene in the foreclosure action. *Id.* Cumberland Lumber and Lowe's argued that they had no duty to intervene in the foreclosure action and that the bank's failure to include them resulted in their liens surviving the foreclosure sale. *Id.* The Kentucky Court of Appeals held that a plaintiff in a foreclosure action must name lienholders of whom he is aware in his petition, but that he need not name those who acquire liens after the petition is filed. *Id.* at 405. It further held that one who acquires an interest in property—in this case, Cumberland Lumber and Lowe's—"whether by purchase, lien or other encumbrance, after the filing of a lis pendens notice takes that interest subject to the results of the litigation." *Id.* It concluded that the foreclosure sale extinguished Cumberland Lumber's and Lowe's liens. *Id.* at 406.

While *Cumberland Lumber Co.* describes the effect of a foreclosure sale on *liens* acquired *after* foreclosure proceedings commence, it says nothing about the effect of a foreclosure sale on a *lease* entered into by a property owner and her tenants *before* foreclosure on the property.[7] Thus, it does not support Freddie Mac's argument that the foreclosure sale terminated the Miks' lease. Nor does it support Freddie Mac's argument that the Miks waived their claims by failing to intervene in the foreclosure action, since

---

[6]A *lis pendens* is "[a] notice, recorded in the chain of title to real property, required or permitted in some jurisdictions to warn all persons that certain property is the subject matter of litigation, and that any interest acquired during the pendency of the suit are subject to its outcome." *Black's Law Dictionary* 1015 (9th ed. 2009).

[7]Freddie Mac fails to distinguish a "lease" from a "lien." A "lien" is "[a] legal right or interest that a creditor has in another's property, lasting usu. until a debt or duty that it secures is satisfied." *Black's Law Dictionary* 1006 (9th ed. 2009). A "lease" is "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration, usu. rent." *Id.* at 970.

it deals with the obligations of lienholders who become aware of foreclosure proceedings, not tenants.[8]

The parties do not identify—and our research does not reveal—a Kentucky statute that outlines the rights and the obligations of successors in interest to foreclosed properties. However, Kentucky common law provides some guidance. Under Kentucky common law, the purchaser of property at a foreclosure sale is entitled to possess the property after the sale is confirmed and may evict tenants who continue to occupy the property pursuant to a pre-existing lease agreement.

The plaintiff in *Castleman v. Belt*, 41 Ky. 157, 157 (1841), purchased a house at a foreclosure sale that was occupied by tenants pursuant to their lease agreement with the previous owner. The Kentucky Court of Appeals[9] made the following observation regarding the effect of the foreclosure on the lease:

> But although neither the antecedent mortgage nor subsequent sale and conveyance under the decree created any such retrospective privity between Castleman and the lessees of the mortgagor as would, *per se*, imply the relation of landlord and tenant, as between those tenants and Castleman antecedently to the conveyance of the whole title to him under the decree; yet, nevertheless, they might have been treated by him, after the date of the deed, either as trespassers or as occupants, holding at his will and as his tenants, so long as they afterwards continued to occupy with his implied permission. He might undoubtedly have evicted them in an action of ejectment, and then have maintained trespass for mesne profits, after the date of his deed, had that been the date of his demise. And we are of the opinion that he had a right to waive the trespass and sue in *assumpsit* for use and occupation, for the same intervening period.

*Id.* at 160 (citations omitted). The court concluded that "[a] mortgagee purchasing under a decree foreclosing his mortgage, may, after the date of the decree, treat one in possession under the mortgagor, as tenant or trespasser, *and from the time* of demanding

---

[8]Freddie Mac argues that the Miks failed to intervene in the foreclosure action, despite having knowledge of the proceedings, and, therefore, they "have waived any and all claims they could have made." This is incorrect for two reasons. First, the Miks were not required to intervene in the foreclosure action. Second, although the Miks' claims arose from the same facts as the foreclosure action, the Miks need not assert them in the context of a foreclosure proceeding and can bring them in a separate lawsuit.

[9]Prior to 1976, the Court of Appeals was the highest state court in Kentucky.

possession or obtaining a conveyance, is entitled to the accruing rents." *Id.* Castleman "had a perfect right to the possession," and, thus, "whenever he chose to demand the surrender of it by the mortgagor's tenants, their retention of possession after such demand, might be deemed to have been either under him or wrongful as to him." *Id.*

Subsequent decisions support the proposition that the successor in interest to foreclosed property is entitled to possess it, notwithstanding a pre-existing lease agreement between the foreclosure defendant and her tenants. *Ball v. First National Bank*, 80 Ky. 501, 503 (1882), involved a dispute between a mortgagor's heirs and creditors as to who was entitled to rents paid by the mortgagor's tenants following the mortgagor's death. Considering who was entitled to rents following the judicial sale of the property, the Kentucky Court of Appeals stated that the issue "turn[ed] upon the ownership of the right to the title and the right to the possession." *Id.* at 505. It observed that the purchaser, from the time that the sale was confirmed, was "entitled to a deed and writ of possession," and, therefore, was entitled to rents from the date of confirmation. *Id.* at 506-07. In *Henderson v. Meadows*, 160 S.W.2d 588, 589 (Ky. 1942), the Kentucky Court of Appeals considered an action by Henderson, the purchaser of property at a foreclosure sale, against the county sheriff, who refused to execute a writ of possession to evict the Meadowses, the previous owner's tenants. The court observed that when Henderson was the successful bidder at the foreclosure sale, he gained certain rights, including the right to possess the property, and it directed the circuit court to take steps to place Henderson in possession of the property. *Id.* at 590-91.

More recently, in *Pembroke Road Warehouses, LLC v. Eagle Way AG, LLC*, Nos. 2003-CA-001372, 2003-CA-001373, 2005 WL 2045815, at *1 (Ky. Ct. App. Aug. 26, 2005), the Kentucky Court of Appeals considered three consolidated actions related to foreclosed property on which warehouses that were leased to Pembroke Road Warehouses, LLC ("PRW") were located. On appeal, PRW first argued that the circuit court erred by holding that its lease was terminated by operation of law when the order confirming the sale was entered. *Id.* at *3. The court rejected this argument. *Id.* PRW then argued that after its lease ended, it became a holdover tenant, and a forcible detainer

action was required to remove it from the property.  *Id.*  The court said that such an action was unnecessary because the buyer obtained a writ of possession and Kentucky law has "long recognized" the writ of possession as a remedy available to the buyer at a foreclosure sale.  *Id.*  It concluded that "PRW had no interest in the property following the order confirming the sale" and the buyer "had sole right to possess the property" as of the date that the order and the writ of possession were issued.  *Id.* at \*5.

We derive several principles from these cases.  First, under Kentucky law, a purchaser gains title to and the right to possess foreclosed property at the time the sale is confirmed.  *See Pembroke Road Warehouses, LLC*, 2005 WL 2045815, at \*5; *Henderson*, 160 S.W.2d at 590-91; *Ball*, 80 Ky. at 506-07; *Castleman*, 41 Ky. at 160. The purchaser may treat persons who occupy the property pursuant to a pre-existing lease as tenants, in which case he may charge them rent, or as trespassers, in which case he may evict them.  *Castleman*, 41 Ky. at 160.  A purchaser need not file a forcible detainer action in order to accomplish the eviction and may do so by obtaining a writ of possession. *Pembroke Road Warehouses, LLC*, 2005 WL 2045815, at \*5.  Kentucky law does not appear to require that tenants be joined in the underlying foreclosure action in order to be evicted. *See Henderson*, 160 S.W.2d at 589 (noting that the Meadowses did not object during the course of the foreclosure action).  Furthermore, Kentucky law does not appear to require that tenants receive notice prior to being evicted pursuant to a writ of possession.  *See* Ky. Rev. Stat. Ann. § 426.260(1) (West 2012) (requiring that a purchaser provide ten days' notice in writing to the foreclosure defendant before filing a motion for a judgment for the possession of the land, but not requiring notification to tenants that they must leave the premises).

Under Kentucky law, it appears that the Miks were not entitled to occupy the property after the foreclosure sale and that Freddie Mac complied with Kentucky law by obtaining a writ of possession in order to remove them.  However, this is not the end of the matter.  We must consider the effect of the PTFA on the parties' rights and obligations.

**B.**

The Miks and *amici*[10] argue that the PTFA's requirements for successors in interest preempt conflicting state law. They appear to claim that the PTFA preempts Kentucky law in two different ways. First, the PTFA provides that successors in interest must ordinarily allow *bona fide* tenants to occupy the foreclosed property until the end of their lease term, and, thus, it preempts Kentucky common law holding that a foreclosure terminates a tenant's lease. Second, the PTFA requires successors in interest to provide *bona fide* tenants with 90 days' notice to vacate, and, therefore, it preempts Kentucky law permitting a successor in interest to take possession of property without notice—for example, by obtaining a writ of possession and demanding that tenants surrender possession immediately.

Section 702 provides that "nothing under this section shall affect the requirements for termination of any federal- or State-subsidized tenancy or of any State or local law that provides longer time periods or other additional protections for tenants." PTFA § 702. Thus, the PTFA, by its own terms, does not preempt state law that provides greater protections for tenants. *PNC Bank, Nat'l Ass'n v. Branch*, No. CV 11-596, 2011 WL 2981806, at *1 (D. Ariz. July 22, 2011) ("[T]he Act specifically allows State laws that are more favorable to the tenant."). However, it does preempt state law that is less protective of tenants, such as the provisions of Kentucky law at issue here.[11]

The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S.

---

[10]The National Housing Law Project, Public Justice Center, National Low Income Housing Coalition, and National Law Center on Homelessness and Poverty filed a brief in support of the Miks.

[11]To our knowledge, no court has addressed the question of whether the PTFA preempts less protective state law. Courts have held that the PTFA does not "completely preempt" state law and, thus, it does not convert a state law claim into an action arising under federal law that may be removed to federal court. *See, e.g.*, *Branch*, 2011 WL 2981806, at *1 (holding that the defendant in an unlawful detainer action could not remove to federal court based on the PTFA); *Wells Fargo Bank v. Lapeen*, No. C 11-01932, 2011 WL 2194117, *2-4 (N.D. Cal. June 6, 2011) (same). However, preemption and removal are "distinct concepts," and a state law claim may be preempted without necessarily being removable to federal court. *Wright v. Gen. Motors Corp.*, 262 F.3d 610, 614 (6th Cir. 2001) (internal quotations marks and citation omitted).

Const. art. VI, cl. 2. "A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Congress may do so "by enacting a statute containing an express preemption provision." *Arizona v. United States*, 132 S. Ct. 2492, 2500-01 (2012). Courts also will find that Congress has preempted state law in at least two other circumstances. "First, the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* at 2501. "Second, state laws are preempted when they conflict with federal law." *Id.* This includes situations in which "compliance with both federal and state regulations is a physical impossibility" and those where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted). "[C]ourts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The Miks and *amici* allege that Kentucky law presents an obstacle to accomplishing the PTFA's purpose. "What is a sufficient obstacle" to warrant preemption "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. "'If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.'" *Hines v. Davidowitz*, 312 U.S. 52, 68 n.20 (1941) (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)).

"The objective of [the PTFA] is to ensure that tenants receive appropriate notice of foreclosure and are not abruptly displaced." Protecting Tenants at Foreclosure: Notice of Responsibilities Placed on Immediate Successors in Interest Pursuant to Foreclosure of Residential Property, 74 Fed. Reg. 30,106 (June 24, 2009); *see also* 155 Cong. Rec. S5111 (daily ed. May 5, 2009) (statement of Sen. John Kerry) (observing that

the PTFA would address "a rampage of sudden evictions of renters" caused by foreclosures and "help unsuspecting renters from falling victim to foreclosure in which they played absolutely no part").  In the debates leading up to its passage, sponsors of the PTFA observed that tenants often had "no idea" that their home was about to be foreclosed and could "be evicted with absolutely no notice."  *Id.*; *see also id.* at S5096 (statement of Sen. Kirsten Gillibrand) ("Families . . . can literally get kicked out on the street because the landlord has failed to meet his payments or his or her obligations."). Senator Kerry observed that "[a] landlord should not be allowed to come in, change the locks, and force out tenants who were there completely legitimately, with an expectation that they were coming home to their same old home."  *Id.* at S5111.  They argued that the PTFA's restrictions on successors in interest are necessary to protect tenants.  *Id.* (stating that under the PTFA, "tenants in any federally related mortgage loan or any dwelling or residential real property with a lease have a right to remain in the unit until the end of the existing lease"); *see also id.* at S5097 (statement of Sen. Kirsten Gillibrand) ("This amendment would allow any tenants in a foreclosed building the right to live out their lease, providing them with the same protections any other renter would have.").

The purpose of the PTFA could not be accomplished if it did not preempt state laws that set lower standards for successors in interest than the Act requires.  Therefore, the PTFA preempts state law that is less protective of tenants, including the provisions of Kentucky law at issue here.

## C.

Courts recognize that tenants can invoke the PTFA as a defense to an unlawful detainer action.  *See, e.g.*, *Blue Mountain Homes, LCC v. Short,* No. 2:13-CV-0913, 2013 WL 1966224, at *2 (E.D. Cal. May 10, 2013)*; Wells Fargo Bank v. Lapeen*, No. C 11-01932, 2011 WL 2194117, at *4  (N.D. Cal. June 6, 2011).  Freddie Mac argues that "the PTFA is regarded as a defensive measure only" and that the Miks are making "an end-run around the fact that the PTFA does not provide a private right of action" by bringing state law claims that rest on violations of the Act.  To our knowledge, only one

court has considered whether violations of the PTFA can be used "offensively" to establish a state law cause of action. *See Webb v. Green Tree Srvicing, LLC*, No. ELH-11-2105, 2011 WL 6141464, at *7 (D. Md. Dec. 9, 2011). We hold that they can.

In an analogous case, the Seventh Circuit explained why a violation of federal law can support a state law claim, even when—or, perhaps, *especially* when—there is no private right of action under a federal statute. In *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 544 (7th Cir. 2012), Lori Wigod sued Wells Fargo Bank, her home mortgage servicer, for refusing to modify her loan pursuant to the federal Home Affordable Mortgage Program ("HAMP"),[12] asserting violations of Illinois law under common-law contract and tort theories. The district court dismissed the complaint, reasoning that Wigod's claims were based on Wells Fargo's obligations under HAMP, which does not provide a private right of action. *Id.* at 555. The Seventh Circuit held that Wigod adequately pled four claims under Illinois law. *Id.* at 560-576. It then rejected Wells Fargo's argument that federal law preempted those claims, including Wells Fargo's "novel theory" that Wigod's claims were displaced "because they attempt an 'end-run' on the lack of a private right of action under HAMP itself." *Id.* at 576. The court observed that "[t]he absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law." *Id.* at 581. "To find otherwise would require adopting the novel presumption that where Congress provides no remedy under federal law, state law may not afford one in its stead." *Id.*

In order to demonstrate "the novelty of Wells Fargo's argument," the court pointed to:

> the many cases in which the Supreme Court has confronted issues of subject matter jurisdiction presented by state common-law claims that incorporate federal standards of conduct, without so much as a peep about whether state law may do so without being preempted. *See*, *e.g.*, *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545

---

[12]Like the PTFA, HAMP also emerged during the financial crisis as part of TARP. *Wigod*, 673 F.3d at 556.

U.S. 308, 312 (2005) (quiet title action brought under state law "turn [ed] on substantial question[] of federal law" because "the interpretation of the notice statute in the federal tax law" was an "essential element of [plaintiff's] quiet title claim"); *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 805-07 (1986) (violation of federal labeling requirements in the Federal Food, Drug, and Cosmetic Act created a rebuttable presumption of negligence and proximate cause under state tort law); *Moore v. Chesapeake & Ohio Ry.*, 291 U.S. 205, 214-15 (1934) (Kentucky worker's compensation statute provided that employer railroad's violation of Federal Safety Appliance Acts would constitute negligence per se under state law).

*Id.* at 581-82 (parallel citations omitted). It observed that although these cases considered "whether the presence of a federal issue in a state-created cause of action gives rise to federal question jurisdiction under 28 U.S.C. § 1331," none of the cases "even suggested that the absence of a private right of action under a federal statute would prevent state law from providing a cause of action based in whole or in part on violations of the federal law." *Id.* at 582. It concluded that "a state-law claim's incorporation of federal law has never been regarded as disabling, whether the federal law has a private right of action or not." *Id.* at 582. *See also College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595-99 (4th Cir. 2005) (holding that the plaintiff could use violations of the federal Higher Education Act of 1965 to establish its state law claims and observing that "the availability of a state law claim is even *more* important in an area where no federal private right of action exists").

As *amici* argue, the PTFA targets the problem of successors in interest who do not follow state law eviction procedures and simply lock tenants out of their homes. *See* 155 Cong. Rec. S511 (daily ed. May 5, 2009) (statement of Sen. John Kerry) ("A landlord should not be allowed to come in, change the locks, and force out tenants who were there completely legitimately, with an expectation that they were coming home to their same old home."). In cases where successors in interest do not initiate judicial proceedings, tenants have no opportunity to raise the PTFA as a defense. Thus, they must be permitted to use available state law causes of action, such as wrongful eviction, to enforce the PTFA's protections. We agree with *amici*'s statement that "[t]he PTFA would be rendered virtually meaningless if the foreclosure sale purchaser could ignore

its protections with impunity, bypass judicial process and evict any tenant without notice or court process." Thus, we reject Freddie Mac's argument that the Miks cannot use violations of the PTFA to establish their state law claims.

**V.**

With these principles in mind, we now turn to the Miks' specific claims.

**A.**

First, the complaint alleges that the Miks "were wrongfully evicted when [Freddie Mac] failed to follow due process prior to evicting the [Miks] from their home."

"To evict a tenant is to deprive him of the possession of the leased premises or disturb him in their beneficial enjoyment so as to cause the tenant to abandon the premises." *Estes v. Gatliff*, 163 S.W.2d 273, 276 (Ky. 1942). Kentucky recognizes a tort claim for wrongful eviction:

> "Where a tenant is wrongfully evicted by his landlord or by persons for whose acts the landlord is responsible, he may maintain therefor an action of tort against the landlord and may recover as general damages the actual or rental value of the unexpired term less the rent reserved, * * * and in addition, therto [sic], compensation for whatever other loss results * * * which can be ascertained with a reasonable degree of certainty and can properly be said to have been the natural or usual result of the breach and reasonably to have been within the contemplation of both parties as the probable result of a breach."

*Kearns v. Sparks*, 296 S.W.2d 731, 732 (Ky. 1956) (quoting 32 Am. Jur., Landlord & Tenant § 265); *see also Batson v. Clark*, 980 S.W.2d 566, 576-77 (Ky. Ct. App. 1998) (acknowledging that a wrongful eviction may also be characterized as a breach of contract claim). A landlord can be held liable for wrongful eviction even if he did not engage in an "intentional wrongful act." *Kearns*, 296 S.W.2d at 732-33.

The Miks allege that they occupied Meyer's home pursuant to a valid lease agreement. They assert that under the PTFA, they had a right to remain in the home after the foreclosure sale, that Freddie Mac did not allow them to stay for the duration

of their lease, and that Freddie Mac evicted them without providing 90 days' notice. They contend that they were injured as a result of this eviction. The facts alleged by the Miks are plausible and support a claim for the tort of wrongful eviction. Therefore, we reverse the district court's dismissal of the Miks' complaint with respect to this claim.

## B.

The complaint also alleges that Freddie Mac "failed to follow due process prior to evicting [the Miks] from their home" by "disregard[ing]" the PTFA and by "failing to obtain a Forcible Detainer and name [the Miks] as parties" to the foreclosure action. On appeal, the Miks elaborate on their claim. First, they argue that Freddie Mac violated Kentucky civil procedure by failing to join them in the foreclosure action, either as named or unknown defendants, and by failing to constructively serve them with process. Second, they argue that Freddie Mac violated their federal constitutional rights by failing to provide them with proper notice before evicting them.

To the extent that the Miks seek to bring a claim for violations of Kentucky civil procedure, they fail to state a claim upon which relief can be granted. The Miks do not identify—and our research does not reveal—a cause of action for violations of Kentucky civil procedure. Moreover, Freddie Mac was not a party to the foreclosure action and cannot be held responsible for any procedural defects in the proceedings.

To the extent that the Miks seek to bring a claim for violations of their due process rights under the Fifth Amendment to the United States Constitution, they fail to state a claim upon which relief can be granted because Freddie Mac is not a government actor who can be held liable for constitutional violations. In *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), the Supreme Court established a framework for determining when a government-sponsored corporation[13] is a government actor for constitutional purposes. It held that "where . . . the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains

---

[13]Freddie Mac is a corporation chartered by Congress. 12 U.S.C. § 1452; *see also Cnty. of Oakland v Fed. Hous. Fin. Agency*, 716 F.3d 935, 937 (6th Cir. 2013).

for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 399. Under the *Lebron* framework, Freddie Mac is not a government actor who can be held liable for violations of the Fifth Amendment's Due Process Clause. *See, e.g.*, *Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 75 F.3d 1401, 1406-09 (9th Cir. 1996) (reasoning that Freddie Mac was created by federal law to serve the public by increasing the availability of mortgages but that the government does not control the operation of Freddie Mac through its appointees); *see also Syriani v. Freddie Mac Multiclass Certificates, Series 3365*, No. CV 12-3035, 2012 WL 6200251, at *4 (C.D. Cal. July 10, 2012) (holding that Freddie Mac is not a government actor even though the Federal Housing Finance Agency ("FHFA") became Freddie Mac's conservator in 2008).

Therefore, we affirm the district court's dismissal of the Miks' complaint with respect to this claim.

## C.

Finally, the complaint alleges that Freddie Mac's conduct was "outrageous and inflicted severe emotional distress upon the [Miks]."

The Kentucky Supreme Court recognized the tort of outrageous infliction of emotional distress in *Craft v. Rice*, 671 S.W.2d 247, 251 (1984). The elements of the claim are:

> 1. The wrongdoer's conduct must be intentional or reckless;
>
> 2. The conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;
>
> 3. There must be a causal connection between the wrongdoer's conduct and the emotional distress; and
>
> 4. The emotional distress must be severe.

*Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996).

"The standards for this tort are strict." *Mineer v. Williams*, 82 F. Supp. 2d 702, 706 (E.D. Ky. 2000). "[A] plaintiff alleges facts sufficient to support a finding of intentional or reckless infliction of emotional distress by alleging that the defendant has engaged in conduct which has been . . . 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). A claim will not lie where a defendant's conduct, though "unfortunate, . . . was not the kind of indecent and immoral behavior that would engender the ire, rather than the mere disapproval, of a civilized community." *Lynch v. McFarland*, 893 F. Supp. 707, 708 (W.D. Ky. 1995), *rev'd on other grounds*, 111 F.3d 131 (6th Cir. 1997) (unpublished table decision).

Kentucky courts have found plaintiffs' proof of outrageous conduct sufficient to support a claim in cases where the defendants:

> (1) harassed the plaintiff by keeping her under surveillance at work and home, telling her over the CB radio that he would put her husband in jail and driving so as to force her vehicle into an opposing lane of traffic; (2) intentionally failed to warn the plaintiff for a period of five months that defendant's building, in which plaintiff was engaged in the removal of pipes and ducts, contained asbestos; (3) engaged in a plan of attempted fraud, deceit, slander, and interference with contractual rights, all carefully orchestrated in an attempt to bring [plaintiff] to his knees; (4) committed same-sex sexual harassment in the form of frequent incidents of lewd name calling coupled with multiple unsolicited and unwanted requests for homosexual sex; (5) was a Catholic priest who used his relationship [as marriage counselor for] the [plaintiff] husband and the wife to obtain a sexual affair with the wife; (6) agreed to care for plaintiff's long-time companion-animals, two registered Appaloosa horses, and then immediately sold them for slaughter; and (7) subjected plaintiff to nearly daily racial indignities for approximately seven years.

*Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 789-90 (Ky. 2004) (internal quotation marks and citations omitted).

The conduct alleged by the Miks is not sufficiently "extreme" or "atrocious" to be considered outrageous. Freddie Mac's alleged conduct was certainly "unfortunate"

and likely violated the PTFA.  Nonetheless, the procedure that Freddie Mac followed to evict the Miks generally conformed to Kentucky law prior to the passage of the PTFA, providing support for the conclusion that Freddie Mac's alleged conduct was not "atrocious" and, in fact, was considered acceptable prior to recent changes in the law. Therefore, we affirm the district court's dismissal of the Miks' complaint with respect to this claim.

## VI.

For these reasons, we reverse the district court's dismissal of the Miks' complaint with respect to the Miks' claim for wrongful eviction.  We affirm the district court's dismissal of the Miks' claims for denial of due process and outrageous infliction of emotional distress.